[No. 44851.   En Banc.   April 13, 1978.]

MARLIN J. HERBERG, *Respondent,* v. RUSSELL B. SWARTZ, ET AL, *Defendants,* REAL ESTATE CONSULTANTS, INC., *Appellant,* D. R. CARRELL, ET AL, *Respondents.*

*David H. Putney* (of *Halverson, Applegate & McDonald*), for appellant.

*Nashem, Prediletto, Schussler & Halpin* and *Don W. Schussler*, for respondent Herberg.

*Warren L. Dewar, Jr.* (of *Velikanje, Moore & Shore*), for respondents Graham, et al.

*J. Eric Gustafson* and *J. Hugh Aaron* (of *Lyon, Beaulaurier, Aaron, Weigand & Suko*), for respondent City of Yakima.

*Dennis L. Fluegge* (of *Gavin, Robinson, Kendrick, Redman & Mays*), for respondents Carrell, et al.

*Daniel F. Sullivan* and *Donovan R. Flora* on behalf of Washington State Trial Lawyers Association, amici curiae.

STAFFORD, J.—Appellant Real Estate Consultants, Inc., appeals a judgment entered on a jury verdict in two actions which were consolidated for trial. We affirm.

Appellant purchased the Chieftain Hotel in August of 1973. On October 19, 1973, the hotel was inspected for compliance with the state's minimum fire and life safety standards for transient accommodations. Although approximately 23 state fire code violations were discovered, appellant was given 5 1/2 months to correct them.

Two months later, on December 19, 1973, an arson fire was started on the hotel's first floor. At this time most of the fire code deficiencies were still uncorrected. Appellant notified the City of Yakima (City) fire department sometime in the midafternoon and evacuated all tenants. Before the fire department could arrive the fire had spread throughout the hotel. The fire's rapid spread was caused by at least five, and potentially by twenty, of the uncorrected

fire code deficiencies. One serious deficiency in particular, open pipe chases which ran vertically and horizontally throughout the building, accelerated and spread the fire, acting as a series of open chimney flues.

That evening the fire mushroomed from the pipe chases into the attic, causing the roof to collapse. Thereafter efforts to suppress the fire were limited to the exterior of the building.

The fire continued to burn throughout the evening and into that night. At 3 a.m. on December 20, the east wall collapsed. By the afternoon of December 20, the fire was creating such a hazard that the City determined demolition of the remaining walls was necessary. Consequently, appellant engaged Carrell Trucking (Carrell) to reduce the walls to a safe level.[1]

Carrell arrived with the demolition equipment that evening and worked on the south wall until 10 or 11 p.m. at which time inadequate visibility prevented further demolition efforts. That night the fire destroyed the supporting structure of the remaining walls. The next morning, December 21, Carrell resumed demolition efforts. However, Carrell discontinued all but standby work at noon following a disagreement with appellant concerning liability coverage to protect Carrell. After 8 hours of negotiation, Carrell and appellant executed a written contract to indemnify Carrell.[2] Thereafter, Carrell resumed full demolition efforts on the west wall. By that time the fire had burned in excess

---

[1]John Carrell indicated, by deposition and affidavit, that the original performance agreed upon was that Carrell would reduce the walls to a safe level. Darrell Lee, an insurance adjuster who originally contacted Carrell on appellant's behalf, indicated in his deposition that the original contract required a reduction of the walls to permit the City to continue fire suppression efforts. Thus, we must assume the performance required by the original contract was demolition to a "safe level."

[2]"RELEASE AND AGREEMENT TO HOLD HARMLESS"

"THIS AGREEMENT is entered into this 21st day of December, 1973, by and between REAL ESTATE CONSULTANTS INC., a corporation, Owner, and First Party,

of 50 hours. After ravaging the hotel the fire was eventually contained.

After Carrell had demolished the west wall, only the north wall and the centrally–located elevator shaft remained standing. As Carrell began demolition of the elevator shaft, the crane's cable became entangled. During efforts to extricate the cable from the shaft, the north wall collapsed and fell on the adjoining store owned by respondent Herberg.

In one action respondent tenants sued appellant for loss of their personal property. Appellant asserted a common–law claim for indemnity against the City based upon the City's alleged active negligence in its fire fighting procedures and its failure to contain the fire.

In a second action respondent Herberg sued appellant *and* Carrell alleging negligence. Appellant, in turn, asserted common–law indemnity claims against *both* the City and Carrell. Carrell thereafter asserted its written contract of

---

and CARRELL CRANE AND HEAVY HAULING, by JOHN P. CARRELL, Contractor, and Second Party, WITNESSETH:

"WHEREAS, negotiations have been pending between the parties for knocking in outside walls of the Chieftain Hotel building in downtown Yakima, Washington, which has been destroyed by fire, part of which work has been completed; and

"WHEREAS, the parties are desirous of defining their respective rights and obligations with respect to the work that has been accomplished, and the work yet to be accomplished in this connection;

"Now, THEREFORE, the parties hereto hereby agree as follows:

"1. First Party will pay Second Party for their services on an hourly basis for labor and equipment at prevailing rates normally charged by Second Party for emergency work. This shall include all standby time of Friday, December 21, 1973.

"2. Second Party agrees to perform the work in a good and workmanlike manner, as is possible in the circumstances where the wall structures are in an unknown and dangerous condition. Because of this lack of knowledge, Second Party can make no guarantys [*sic*] and First Party assumes this risk.

"3. First Party does hereby release Second Party and hold them harmless from any and all obligations, claims, damages or demands of any kind or character whatsoever, including all legal fees and expenses of defense, that might be brought or asserted against Second Party arising out of the job other than those arising out of Second Party's own gross negligence."

indemnity against appellant and also sought common–law indemnity from the City.

The two actions were consolidated for trial. Prior to trial, the court entered a summary judgment that the written indemnity contract between Carrell and appellant was supported by consideration. The court also granted a summary judgment that appellant was negligent per se for operating the hotel in violation of RCW 70.62. On the day of trial, but prior to the presentation of evidence, Carrell's motion to dismiss appellant's common–law indemnity claim was granted. Thereafter, Herberg took a voluntary nonsuit in his action against Carrell.

During trial, and in response to respondents' motions to exclude evidence of the superseding or intervening negligence of the City and Carrell, appellant's common–law indemnity claim against the City was dismissed and the evidence was excluded. With all claims against the City and Carrell having been dismissed, settled, or nonsuited, the consolidated actions were submitted to the jury with appellant as the sole defendant.

The jury returned verdicts for both respondent hotel tenants and respondent Herberg. The court entered judgment on the verdicts and later denied appellant's motions for judgment n.o.v. or for a new trial. The Court of Appeals certified the appeal to this court.

Appellant assigns error to the following actions of the trial court: (1) granting summary judgment that appellant was negligent per se; (2) dismissing appellant's indemnity claim against the City; (3) enforcing the indemnity agreement between Carrell and appellant; (4) excluding evidence of alleged superseding or intervening negligence of the City and Carrell; (5) improperly instructing the jury on proximate causation and apportionment of liability; and (6) failing to strike the tenants' damage testimony and incorrectly instructing the jury on this issue. Appellant also urges us to adopt a rule that will permit contribution. or apportionment of liability among tort–feasors.

We turn first to the determination that appellant was negligent per se for operating the hotel in violation of the minimum fire and life safety standards promulgated under the Transient Accommodations Act, RCW 70.62.290. Appellant asserts that its duties to the tenants and to Herberg should have been tested by the common–law standards of sections 343, 353, 364 and 366 of the Restatement (Second) of Torts (1965). It is argued that under those sections the reasonableness of appellant's actions during the 2 months preceding the fire would have presented a question of material fact. Thus, appellant urges, summary judgment was inappropriate. We disagree.

■ The concept of negligence per se permits a court to substitute legislatively required standards of conduct for lesser common–law standards of reasonableness. *Bayne v. Todd Shipyards Corp.*, 88 Wn.2d 917, 568 P.2d 771 (1977); *Kness v. Truck Trailer Equip. Co.*, 81 Wn.2d 251, 501 P.2d 285 (1972); Restatement (Second) of Torts § 286 (1965). As W. Prosser in *Law of Torts* § 36 (4th ed. 1971) states at page 190:

> When a statute provides that under certain circumstances particular acts shall or shall not be done, it may be interpreted as fixing a standard for all members of the community, from which it is negligence to deviate.

Thus, if a defendant violates an applicable statutory duty, the court may properly instruct the jury that the defendant was in fact negligent. *Goodell v. ITT–Federal Support Serv., Inc.*, 89 Wn.2d 488, 493, 573 P.2d 1292 (1978); *Kness v. Truck Trailer Equip. Co.*, supra at 258; Prosser, *supra,* § 36, at 200. If the statutory duty applies, lesser common–law duties necessarily become irrelevant. *See Moore v. Dresden Inv. Co.*, 162 Wash. 289, 298 P. 465, 77 A.L.R. 1258 (1931).

It is clear that at the time the arson fire was discovered appellant was still in violation of several state fire and life safety standards. Further, the undisputed evidence considered on summary judgment demonstrates that at least five of these violations *caused the fire to spread.* These are the only facts material to a determination of whether appellant

was negligent per se. Consequently, whether summary judgment was proper depends on whether the trial court properly adopted the statutory standards as the duty required of appellant.

We said in *Bayne v. Todd Shipyards Corp., supra* at 920 and in *Kness v. Truck Trailer Equip. Co., supra* at 257:

> The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment, or an administrative regulation whose purpose is found to be exclusively or in part
>
> (a) to protect a class of persons which includes the one whose interest is invaded, and
>
> (b) to protect the particular interest which is invaded, and
>
> (c) to protect that interest against the kind of harm which has resulted, and
>
> (d) to protect that interest against the particular hazard from which the harm results.

Thus, we must determine whether the fire and life safety standards were intended to protect either or both the tenants and Herberg.

RCW 70.62.200 provides that the purpose of the Act is "to promote the protection of the health and welfare of individuals using such accommodations . . ." Further, the fire marshal is specifically directed to promulgate rules and regulations and to enforce the fire and life safety standards. *See* RCW 70.62.290; WAC 248–144–035; WAC 212–12–010(1)(g). These standards were adopted to provide "the highest degree of public safety from fire" consistent with normal use and occupancy of the building. WAC 212–12–010(2). Each of the applicable standards is mandatory. Respondent tenants were residents of the transient accommodation and were harmed by the very danger sought to be prevented. Given the legislature's clear statement of purpose to protect such persons, we hold the trial court properly adopted the statutory and regulatory standards as the appropriate duty owed these tenants by appellant.

The trial court also correctly adopted the standards of RCW 70.62 as the duty owed by appellant to respondent

Herberg. That the legislature intended the same protective policy to extend to landowners in the immediate vicinity of the danger is based on the Act, the regulatory standards, and on common sense.

RCW 70.62.290 provides:

> Rules and regulations establishing fire and life safety requirements, not inconsistent with the provisions of this chapter, *shall* continue to be promulgated and *enforced* by the state fire marshal's office.

(Italics ours.) Unlike RCW 70.62.200, this mandatory directive is not expressly limited to mere protection of persons actually "occupying such accommodations." Rather, in considering other statutory duties of the state fire marshal we find that he is authorized to enter

> upon all premises and into all buildings except private dwellings for the purpose of inspection to ascertain *if any fire hazard exists, and to require conformance with minimum standards for the prevention of fire and for the protection of life and property against fire and panic* as to use of premises . . .

(Italics ours.) RCW 48.48.040(1). When the fire marshal finds any fire hazard "dangerous to the safety of the building, premises, or to the public," he must order such condition remedied. RCW 48.48.050(1). These statutes are interrelated and must be so considered. Viewed from this perspective, we must conclude that the Transient Accommodations Act was not intended merely to protect transient occupants but was also intended to protect the *public reasonably expected to be endangered* by the fire hazard.

Further, a review of the state fire marshal's regulations reveals that they too are designed to promote "the *highest* degree of *public* safety from fire." WAC 212–12–010(2). In fact, several of the statutory and regulatory standards violated herein were concerned exclusively with preventing the *spread* of fire, thus clearly evidencing an intent to protect those reasonably expected to be within the zone of danger from such spread. For example, Standard

No. 3 required interior stairways to be enclosed or cut off at floor level. The explanatory comment states:

> Past fire experience in multi–story buildings, substantiated by the school fire tests, have [sic] conclusively established that the single–most factor in life loss and fire spread is open stairways, which serve as chimneys, accelerating and spreading fire throughout the building in a matter of minutes.

However, Standard No. 4 is even more stringent in its treatment of vertical openings, such as pipe chases. The explanatory comment notes the "chimney effect" caused by such vertical openings and, unlike stairways, the standard pertaining to *pipe chase* enclosures is *mandatory*. No alternative corrective device is permitted. It is evident that these safety standards were designed to prevent the precise harm which occurred here. Safety legislation is to be liberally construed, and for good reason. *See Pacific Shrimp Co. v. United States Dep't of Transp.*, 375 F. Supp. 1036, 1043 (W.D. Wash. 1974); *Lilly v. Grand Trunk W.R.R.*, 317 U.S. 481, 87 L. Ed. 411, 63 S. Ct. 347 (1943).

These standards, admittedly violated, were intended to preclude the rapid spread of fire. Respondent Herberg was a member of that public reasonably expected to be endangered by the contemplated hazards involved. Thus, the trial court correctly adopted the legislative standard as the one by which to measure appellant's duty vis–a–vis Herberg.

Appellant suggests the 5 1/2 months given to correct the violations should affect the applicability of the foregoing legislative standards. The argument was not raised below and we will not consider it further. An issue, theory or argument not presented at trial will not be considered on appeal. *Boeing Co. v. State*, 89 Wn.2d 443, 450–51, 572 P.2d 8 (1978).

Appellant next assigns error to the dismissal of its common–law claim for indemnity against the City.[3] This

---

[3]The dismissal occurred in connection with plaintiff's motions to exclude evidence of the superseding or intervening negligence of the City and Carrell. The

claim is based upon *Rufener v. Scott,* 46 Wn.2d 240, 242, 280 P.2d 253 (1955), wherein we said:

> It is the general rule that there is no right of indemnity between joint tort–feasors. *Duncan v. Judge,* 43 Wn. (2d) 836, 264 P. (2d) 865. However, if the tort–feasors are not *in pari delicto,* and the negligence of one is primary or active, and the negligence of the other is passive, resulting in injury to a third person, and the one guilty of passive negligence is required to answer in damages to the third person, he is entitled to indemnity from the wrongdoer guilty of primary negligence.

*See also Deutsch v. West Coast Mach. Co.,* 80 Wn.2d 707, 718, 497 P.2d 1311 (1972); *Reefer Queen Co. v. Marine Constr. & Design Co.,* 73 Wn.2d 783, 787, 440 P.2d 453 (1968). The error is said to be the trial court's determination that appellant was *actively negligent* and thus was not entitled to obtain common–law indemnity from the City. We find no error.

The undisputed facts reveal appellant purchased the hotel in August of 1973. In October 1973 it was officially notified (1) of over 20 violations of the minimum fire and life safety standards; (2) of the hazard thereby created; and (3) of the corrective measures needed to prevent the potential spread of fire. Nevertheless, appellant continued to operate the hotel for 2 months without making the most basic corrections. The fire's spread was caused by at least five of the uncorrected violations. In fact the fire had begun its hazardous spread well before the city fire department arrived. These facts clearly warranted the trial court's ruling that appellant was *actively negligent.* Such negligence continued *at least* until the fire spread. Under *Rufener* and its progeny, such active negligence precludes appellant's claim for common–law indemnity from the City. Accordingly, this claim was properly dismissed.

---

trial court treated it as a motion for summary judgment of dismissal after inquiring whether appellant planned to offer any evidence to dispute the fact that the fire had spread before the City's arrival. Appellant conceded none would be offered. Thus, the trial court after considering the depositions, affidavits, and pleadings granted, in effect, a summary judgment of dismissal after finding that all material facts were undisputed.

Appellant also challenges the summary judgment granted Carrell based on the trial court's determination that the written indemnity *contract* was supported by consideration. Appellant argues that the written contract required appellant to indemnify Carrell yet required nothing new of Carrell in return. Thus, appellant contends, the written contract was not supported by consideration and its cross motion for summary judgment voiding the written contract should have been granted. We agree summary judgment was inappropriate. There was a factual dispute concerning whether Carrell had fully performed its original agreement by reducing the walls to a safe level *before* entering the new contract. However, the error was harmless. Carrell asserted the written indemnity contract as a complete *defense* to appellant's common–law indemnity claim against Carrell. The validity of the contract and thus the *defense* would have been significant only if appellant was entitled to assert its primary common–law indemnity claim. We have already approved the trial court's determination that appellant was *actively* negligent with respect to the fire's spread. Such negligence, standing alone, would defeat appellant's common–law indemnity claim. The absence of any *primary* indemnity claim against which the contract defense could be asserted renders the written contract immaterial to a determination of indemnity rights between the parties.

Appellant's trial theory was that the negligence of the City and/or Carrell was a superseding or intervening cause of the harm. Appellant here argues it should have been allowed to introduce evidence of such claimed superseding or intervening negligence. We find no error.

■ The terms "intervening" and "superseding" cause are often used interchangeably. *See Mehrer v. Easterling,* 71 Wn.2d 104, 426 P.2d 843 (1967); *Cook v. Seidenverg,* 36 Wn.2d 256, 217 P.2d 799 (1960); Restatement (Second) of Torts § 440 (1965). However, the theoretical underpinning of an *intervening* cause which is sufficient to break the original chain of causation is the *absence of its foreseeability. Boeing Co. v. State,* 89 Wn.2d 443, 446, 572 P.2d 8

(1978); *Maltman v. Sauer,* 84 Wn.2d 975, 982, 530 P.2d 254 (1975); *Fosbre v. State,* 70 Wn.2d 578, 584, 424 P.2d 901 (1967). Further, insofar as here applicable the question of whether the intervening act is a *superseding* cause depends upon whether it brings about a different kind of harm or whether it operates independently of the situation created by the actor's negligence. *See Cook v. Seidenverg, supra* at 264; Restatement (Second) of Torts §§ 442–45 (1965).

In the instant case neither theory applies. The trial court correctly determined, as a matter of law, that appellant could reasonably have foreseen that *both* the assistance of the fire department and demolition efforts would be necessary in the event of a fire. Negligence, if any, of either the City or Carrell was activated by appellant's own negligence in failing to correct the many code deficiencies which caused the fire to spread. Appellant argues no other theory at trial which might have made such evidence relevant. Since the trial court correctly determined that appellant could reasonably have foreseen the need for assistance by both the City and a demolition team, the proffered evidence was irrelevant and properly excluded. Finding no error in excluding such evidence there was no error in the trial court's refusal to instruct the jury on the issue.

In a similar vein, appellant challenges the trial court's ultimate exclusion of all evidence of negligence by the City and Carrell. This ruling is said to have effectively precluded appellant from presenting its theory that *the sole proximate cause* of the harm was the negligence of either Carrell or the City. Error is also assigned to the court's refusal to give appellant's proposed "sole proximate cause" instruction.

Appellant's theory of "sole proximate cause" was not timely raised.[4] It was not raised below when the evidence

---

[4]Nowhere in the extensive argument on causation and exclusion of evidence was this theory mentioned. Appellant's trial theory was premised exclusively upon the argument that the negligence of the City or Carrell was (1) *a* proximate cause; (2) *a* superseding or intervening cause; or (3) active while appellant's negligence

might have been considered. In fact, the trial court was first apprised of the theory *when appellant proposed its instruction.* By that time both the City and Carrell had been dismissed from the lawsuit. Appellant has not properly claimed or preserved this assignment of error and we will not consider it further. *International Tracers of America v. Estate of Hard,* 89 Wn.2d 140, 147, 570 P.2d 131 (1977). *See also State v. Blight,* 89 Wn.2d 38, 44, 569 P.2d 1129 (1977).

We also reject as untimely appellant's contention that we should adopt contribution among tort–feasors or allow the apportionment of liability between tort–feasors. When the issue was initially raised by the trial court appellant denied it was asserting anything other than indemnity claims. The change of theory was first urged upon the trial court when appellant proposed its instructions. This was long after both the City and Carrell had been dismissed from the case. Consequently, appellant has failed to properly preserve this assignment of error. *International Tracers of America v. Estate of Hard, supra* at 147; *State v. Blight, supra* at 44.

Appellant's final assignment of error relates to the damages recoverable by the tenants for loss of their personal property. Appellant argues that the *tenants'* testimony on damages should have been stricken. Error is also assigned to the court's damage instruction and to the court's failure to give appellant's proposed damage instructions.

Dealing first with error assigned to the trial court's instruction and the failure to substitute appellant's in its place, we must admit we are perplexed. Appellant provides us with no verbatim reference to the challenged instruction, but is content to vaguely assign error to the "measure of damages and the giving of the court's damage instruction." Then, appellant argues that the court's instruction No. 10 is erroneous insofar as the *tenants'* damages are concerned. Yet, instruction No. 10 does not pertain to the *tenants.* Rather, it is limited to respondent Herberg. Further,

---

was passive. By the time appellant raised the issue now presented, the City and Carrell had long since been dismissed from the law suit.

appellant argues that its proposed instruction No. 11 should have been given in the place of the court's No. 10. However, the record does not disclose that an instruction No. 11 was proposed by appellant. These are neither adequate assignments of error nor adequate arguments thereon.

Concerning the testimony of the tenants, appellant suggests that the damages recoverable for loss of their personal property are controlled by *McCurdy v. Union Pac. R.R.*, 68 Wn.2d 457, 467, 413 P.2d 617 (1966) wherein we stated:

> The primary principles to be applied in awarding damages for negligent injuries to property is that the owner shall have actual monetary compensation for the loss sustained. If the property is a total loss the measure of damages is the value of the property destroyed or damaged. This is its market value, if it has a market value. If the property is damaged but not destroyed, the measure of damages is the difference between the market value of the property before the injury and its market value after the injury. (Again, if it has a market value.) If the property does not have a market value, then if a total loss, the measure of damages is the cost to replace or reproduce the article. If it cannot be reproduced or replaced, then its value to the owner may be considered in fixing damages.

Appellant asserts that the test is not replacement cost. Rather it is the value of that item to the individual at the time. We agree, but for different reasons.

We are here concerned with the damages recoverable for loss of household goods, wearing apparel, and other personal effects kept for personal use and not for sale. We said in *Kimball v. Betts*, 99 Wash. 348, 350–51, 169 P.2d 849 (1918):

> "It is now generally recognized that wearing apparel in use, and household goods and effects owned and kept for personal use, are articles which cannot in any fair sense be said to be marketable, and have a market value, or at least a market value which is fairly indicative of their real value to their owner and of his loss by being deprived of them. So it has been frequently, and we

think correctly, held that the amount of his recovery in the event of conversion ought not to be restricted to the price which could be realized by a sale in the market [or market value], *but he should be allowed to recover the value to him based on his actual money loss, all the circumstances and conditions considered, resulting from his being deprived of the property, not including, however, any sentimental or fanciful value he may for any reason place upon it."*

(Italics ours.)

Appellant asserts the tenants' testimony should have been stricken because they were allowed to testify that the value to them, under *Kimball,* was replacement value. The record does not support appellant's assertion.

Each tenant[5] testified concerning the value placed upon the various items of personal property. Each was examined concerning the condition of the property, the approximate date of purchase, and the approximate purchase price. Each also testified that the value indicated represented the reasonable value to them. Only Oaland Graham, on cross-examination, indicated that the value represented replacement value. Further cross-examination reveals, however, that Graham was confused by counsel's original question and that the value to Graham was meant to represent his own estimation of value to him. Thus testimony is clearly within the guidelines of *Kimball* wherein we stated at page 352:

"When goods of this character are destroyed, a proper method of arriving at their value at the time of loss is to take into consideration the cost of the articles, the extent of their use, whether worn or out of date, their condition at the time, etc., and for them to determine what they were fairly worth. The cost alone would not be the correct criterion for the present value, but it would be difficult to estimate the value of such goods, except by

---

[5]Tenant Wong Soon testified by videotape deposition. The testimony of Wong Soon has not been transcribed nor submitted with the record on appeal. Thus, we cannot determine whether Wong Soon testified to replacement, market, or personal value.

reference to the former price in connection with wear, depreciation, change of style, and present condition."

Both the *Kimball* rule and the evidence admissible thereunder are intended to allow the plaintiff to recover the reasonable value to him of his lost personal property. We find no error.

We note, however, that two tenants testified to loss of family photographs. Such property is particularly susceptible to being valued solely for sentimental purposes, which is impermissible. However, we are unable to determine whether either tenant attached that impermissible a value to such loss. Appellant did not cross–examine either tenant on the point and raised no objection on this basis. While we ordinarily would not permit damages for loss of sentimental value attached to such items, appellant's failure to demonstrate any impropriety at trial precludes further consideration of the claimed error.

Finding no reversible error, we affirm.

WRIGHT, C.J., and ROSELLINI, HAMILTON, UTTER, BRACHTENBACH, HOROWITZ, DOLLIVER, and HICKS, JJ., concur.