[No. 50661–2.   En Banc.   November 21, 1985.]

Ezzat Mina, et al, *Respondents,* v. Boise Cascade
Corporation, *Defendant,* Hofstrand Logging
Company, *Petitioner.*

*Robert R. Redman* and *Steven W. Woods* (of *Gavin, Robinson, Kendrick, Redman & Mays, Inc., P.S.*), for petitioner.

*Prediletto, Halpin, Cannon, Johnson & Scharnikow* and *Richard R. Johnson,* for respondents.

*Andrew C. Bohrnsen* and *Dennis Sweeney* on behalf of Grange Insurance Association, amici curiae for respondents.

DURHAM, J.—In a negligence action arising out of a multivehicle collision, a jury found that defendant Hofstrand Logging Company was negligent and that plaintiff Ezzat Mina was 85 percent comparatively negligent. Mina appealed, and the Court of Appeals reversed the jury verdict and ordered a new trial. Hofstrand challenges the appellate court's determinations that: (1) the evidence introduced at trial did not support a jury instruction based on the statutory prohibition against parking, stopping, or leaving standing a vehicle on the roadway; and (2) retrial will be limited to a determination of the parties' respective liabilities. We affirm the Court of Appeals, although in part on different grounds.

In the early afternoon of February 4, 1980, Ezzat Mina and his wife were driving north on Interstate 82 to their home in Ellensburg following a doctor's appointment in Yakima. The road surface was dry and the sky was clear and sunny until the Minas were 13 miles south of Ellensburg. Here they came upon a fogbank which intensified as they proceeded down into a valley. According to Mr. Mina's testimony, he reset his cruise control from approximately

55 m.p.h. to approximately 35 m.p.h. in response to the changed weather conditions.

That same afternoon, Gary Graham, driving a Hofstrand log truck with its empty trailer in a "piggyback" position, was returning on Interstate 82 to Ellensburg from a delivery made in Yakima. Graham testified that as he entered the fogbank 13 miles south of Ellensburg he reduced the truck speed to 45 m.p.h. After driving through the fog for approximately 1 mile, Graham suddenly saw that he was rapidly approaching two taillights, six to eight car lengths in front of him. His truck began to slide to the left side of the road. When he countersteered, the front end of the truck struck a snowbank on the left shoulder of the road, causing the truck to spin completely around. The truck then slid backward into a ditch in the median strip. The taillights that Graham saw belonged to the Mina vehicle. When the Hofstrand truck spun around, its rear end struck the rear end of the Mina vehicle.

At trial, Mr. Mina testified that he was concentrating on the road in front of him and did not see the Hofstrand truck approach from the rear. He recalled that after feeling the impact from the collision he went into a "state of shock." When he saw that the force of the collision was causing his car to head for a guardrail at the edge of the right shoulder of the road, he closed his eyes and gripped the steering wheel. He did not reopen his eyes until the car came to rest. At some point after the impact but before the car had come to rest, the car engine stalled. When Mr. Mina opened his eyes, he tried, but was unable, to restart the engine. He was disoriented and frightened. He opened his door, got out of the car and told his wife to do the same. Mr. Mina had no further recollection of the incident.

Meanwhile, John N. Samuel, driving a flatbed truck for the Palmer G. Lewis Company, was also traveling north on Interstate 82 that afternoon. When he approached the fogbank, he too reduced his speed. Although he did not see the collision between the Mina vehicle and the Hofstrand truck, he arrived at the scene shortly thereafter. When

Samuel saw the Hofstrand truck in the median strip, he reduced his speed further. He then saw that the right–hand lane of the roadway was obstructed by what he eventually learned was the Minas' vehicle. The Mina car was almost perpendicular to the roadway, but was facing slightly south. Samuel drove into the left–hand lane, reduced his truck speed to 20 m.p.h. and began to pass the car.

Alfred Johnson, driving a Boise Cascade logging truck, was also proceeding north on Interstate 82 that same afternoon. When he entered into the fogbank, he reduced his speed, saw the Hofstrand truck in the median strip, and slowed his truck further. Johnson testified that he saw a car blocking three–fourths of the right–hand lane, and a truck, apparently adjacent to the car, blocking the left–hand lane. Realizing that he did not have time to stop, Johnson drove to the right shoulder of the road in an attempt to pass the Mina car. Instead, the truck struck the rear portion of the car and continued forward until it struck the guardrail on the right shoulder of the road.

Mr. Mina was out of the car and speaking to his wife when the Boise Cascade truck collided with his car. The force of the collision caused the car to hit Mr. Mina, knocking him unconscious. The car then came to rest against the side of the Palmer G. Lewis truck, which was still in the left lane.

The following illustration shows the position of the Mina car (1) where it was hit by the Hofstrand truck (2) at the point of impact with the guardrail, (3) where it was hit by the Boise Cascade truck. "X" denotes the point of impact by the trucks. The Mina vehicle ultimately came to rest approximately 166 feet north of number 3.

At trial, the Minas and Hofstrand each called upon expert witnesses to reconstruct the sequence of events at issue. John A. Talbott testified on the Minas' behalf. He maintained that the Hofstrand truck was traveling at a speed of 28 m.p.h. immediately prior to impact. The impact exerted the equivalent of 450 pounds of force hitting Mr. Mina's body horizontally. Talbott maintained that nine–

tenths of a second elapsed from the time the Mina vehicle was hit by the Hofstrand truck to the vehicle's collision with the guardrail. In describing the movement of the Minas' car during this time period, Talbott stated: "The

Mina car is propelled in a direction toward the guardrail. However, the Mina car is *steered* away from the guardrail." (Italics ours.)

Talbott testified that the car's side struck the guardrail and the car then came to rest in the right lane of the freeway. In describing how the car came to rest after the impact with the guardrail, Talbott opined:

> [The car] was not braked or didn't skid to the . . . position. It didn't wildly gyrate to get to that position . . . [s]o probably . . . there was . . . corrective action . . . which suggests . . . that the driver was probably . . . trying to regain his control and composure. [The] car was *driven* to this location, *steered* to that location.

(Italics ours.) Talbott concluded that although the car was mechanically capable of being steered, it was out of control after it hit the guardrail.

John Habberstad, a mechanical engineer, testified on Hofstrand's behalf. He maintained that the force of the impact between the Hofstrand and Mina vehicles did not result in Mr. Mina "violently being thrown." Habberstad also stated that the Mina vehicle approached the guardrail from the 12–foot–wide shoulder at an angle of no more than 10 degrees. Habberstad concluded that a full 2 seconds elapsed between the vehicle's impact with the truck and its impact with the guardrail. The total time between the initial impact and the Mina vehicle coming to rest was "in excess of 10 seconds." However, Habberstad admitted that, realistically, Mina did not have time to react before striking the guardrail:

> Q: [D]o you have an opinion as to whether immediately following the blow by the Hofstrand truck whether Mr. Mina had adequate time to react to that and correct the path of the vehicle? . . .
> A: . . . [I]f you consider reaction time, which would be a standard ¾ of a second, he theoretically had time to do some correcting.
> Q: Well, theoretically do you think—realistically, do you think he did? . . .

A: Realistically his reaction time because of the accident would have probably been longer than mean [average] and he probably did not.

Habberstad also concurred with Talbott's conclusion that after the car struck the guardrail, it was out of control:

Q: Mr. Habberstad, do you have an opinion whether when the Mina car came off the guardrail after its initial glancing blow . . . whether the vehicle was out of control?
A: As I defined control and as we defined it this morning, yes.
Q: . . . How are you defining it?
A: . . . [T]he driver does not have full control of the vehicle and the vehicle is not necessarily going where he is intending it to go.

Over the Minas' objection, the trial court gave the following jury instruction, which is at the heart of this appeal:

Instruction No. 11
You are instructed that a Washington statute provides:
Outside of incorporated cities and towns no person shall stop, park, or leave standing any vehicle, whether attended or unattended, upon the roadway.
The above section shall not apply to the driver of any vehicle which is disabled in such manner and to such extent that it is impossible to avoid stopping and temporarily leaving the vehicle in such position.

In addition, the trial court instructed the jury that a violation of a statute is "negligence as a matter of law" unless "due to some cause beyond the violator's control."

The jury found that Hofstrand was negligent and Mina was 85 percent comparatively negligent. The Court of Appeals reversed, finding that the evidence introduced at trial did not support giving instruction 11 to the jury. *Mina v. Boise Cascade Corp.*, 37 Wn. App. 445, 681 P.2d 880 (1984). The court also ordered retrial solely on the question of liability. From the Court of Appeals determination, Hofstrand petitioned for review.

The gravamen of Hofstrand's argument is that, after the Mina vehicle was hit, in excess of 10 seconds elapsed before it came to rest on the roadway. During this period, it is

submitted that Mr. Mina could have either (1) steered the car away from the guardrail so that it would have come to rest on the 12–foot–wide right road shoulder, or (2) gotten his car under control after it struck the guardrail and driven off the road. Instead, Mr. Mina closed his eyes, gripped the steering wheel, and steered his car onto the roadway. Thus, argues Hofstrand, because RCW 46.61.560 prohibits stopping on the roadway,[1] Mr. Mina violated the statute and was negligent per se.

In its opinion, the Court of Appeals misperceived Hofstrand's contention. That court analyzed Mr. Mina's predicament after his vehicle came to rest. Because Mr. Mina could not restart his engine after his car came to rest, the Court of Appeals held that it was "utterly impracticable" for Mr. Mina to move his car. *Mina,* at 449. Because the word "impossible" in RCW 46.61.560(2) means "utterly impracticable," *Mina,* at 447, citing *Naranen v. Harders,* 1 Wn. App. 1014, 1019, 466 P.2d 521 (1970), the evidence introduced at trial did not support an instruction based on the statute. *Mina,* at 448–49. While the appellate court misidentified the relevant time frame, its conclusion that the statute was inapplicable is correct and we, therefore, affirm.

■ Although RCW 46.61.560 does not provide for a private cause of action, this court has long held that a violation of a traffic statute can constitute negligence per se. *Portland–Seattle Auto Freight, Inc. v. Jones,* 15 Wn.2d 603, 131 P.2d 736 (1942); *Engelker v. Seattle Elec. Co.,* 50 Wash. 196, 96 P. 1039 (1908). In utilizing the doctrine of negligence per se, a court will substitute a statutory stand-

---

[1]RCW 46.61.560 provided in pertinent part:

"(1) Outside of incorporated cities and towns no person shall stop, park, or leave standing any vehicle, whether attended or unattended, upon the roadway.

"(2) Subsection (1) of this section, RCW 46.61.570, and 46.61.575 shall not apply to the driver of any vehicle which is disabled in such manner and to such extent that it is impossible to avoid stopping and temporarily leaving the vehicle in such position. The driver shall nonetheless arrange for the prompt removal of the vehicle as required by RCW 46.61.590."

ard of conduct for the less restrictive common law standard of reasonableness even though the legislative enactment does not explicitly apply to a private suit. *Herberg v. Swartz,* 89 Wn.2d 916, 922, 578 P.2d 17 (1978). *See generally* Thayer, *Public Wrong and Private Action,* 27 Harv. L. Rev. 317 (1914).

Before a court adopts a more stringent statutory standard of conduct, however, it must first undertake a 2–part analysis. First, the statute must be read "in consonance with [its] intended purpose and the realities of highway safety." (Footnote omitted.) *Petersavage v. Bock,* 72 Wn.2d 1, 8, 431 P.2d 603 (1967). If the underlying statutory purpose does not pertain to the conduct at issue, the doctrine of negligence per se does not apply. *Petersavage,* at 8; *Colvin v. Auto Interurban Co.,* 132 Wash. 591, 597–98, 232 P. 365 (1925). Second, once the court determines that the underlying purpose of the statute was violated, it then must decide, as a matter of policy, if it will apply the statutory standard to the case at bar. *See Kness v. Truck Trailer Equip. Co.,* 81 Wn.2d 251, 257, 501 P.2d 285 (1972).

This court has used Restatement (Second) of Torts § 286 (1965) as a framework for analyzing the second part of this inquiry. *Young v. Caravan Corp.,* 99 Wn.2d 655, 658–59, 663 P.2d 834, 672 P.2d 1267 (1983); *Kness v. Truck Trailer Equip. Co., supra.* However, after reviewing the factors enumerated in § 286, we find that it also provides a framework for evaluating the first part of the relevant inquiry, whether the underlying statutory purpose was violated.

Restatement (Second) of Torts § 286 provides:

> The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part
>
> (a) to protect a class of persons which includes the one whose interest is invaded, and
>
> (b) to protect the particular interest which is invaded, and
>
> (c) to protect that interest against the kind of harm which has resulted, and

(d) to protect that interest against the particular hazard from which the harm results.

Here, Hofstrand, as a driver on the road, is part of the class of persons the Legislature meant to protect. Hofstrand's particular interest in unobstructed highway travel is the type of interest the Legislature meant to protect, and bodily injury is the kind of harm the Legislature meant to prevent. However, the particular hazard which occurred here, *i.e.*, of a vehicle landing on the roadway after a collision, is not the particular hazard envisioned by the Legislature.

A literal construction of RCW 46.61.560 could support Hofstrand's contention that because Mr. Mina's vehicle could have been steered Mr. Mina was negligent per se for allowing his car to come to rest on the roadway. However, we have repeatedly eschewed technical interpretations of traffic statutes that do not conform to the purpose the Legislature intended or the realities of highway safety. *Colvin*, at 597. *See also Petersavage v. Bock, supra; Grubbs v. Grayson*, 165 Wash. 548, 552, 5 P.2d 1033 (1931). The purpose of the park and stop statute is to eliminate the hazard posed when drivers stop their vehicles on high speed freeways for other than emergency reasons. We reject Hofstrand's analysis, which assumes that the Legislature intended the parking and stopping statute to require a victim of a collision to regain his composure, bring his car under control, orient himself, and steer off the roadway prior to his car coming to rest. We are particularly reluctant to find that the statute encompasses Mr. Mina's conduct considering the undisputed testimony of both experts at trial that (1) realistically, Mr. Mina did not have sufficient reaction time to steer away from the guardrail, and (2) Mr. Mina's car was out of control after it hit the guardrail. Because RCW 46.61.560 was not intended to be a driver's skill test, we refuse to hold a driver liable as a matter of law for failing to steer his car off the roadway prior to coming to rest following the impact of a collision.

This interpretation of the park and stop statute is sup-

ported by our analysis in *Petersavage v. Bock, supra*. In that case, the plaintiff was traveling eastbound on an arterial highway when the defendant cut across the highway and made a left turn into the lane in which the plaintiff's car was traveling. The defendant entered the lane directly in front of the plaintiff's car. The defendant argued that the plaintiff was contributorially negligent in hitting the car because the plaintiff violated the passing statute, RCW 46.60.040,[2] which provided:

> Any person driving a vehicle upon any public highway of this state and overtaking another vehicle proceeding in the same direction shall pass to the left of such overtaken vehicle . . .

Although the statute spoke in absolute terms, the court refused to construe the statute literally and impose a duty on a driver to pass on the left side of a car that pulls into his lane directly in front of him. The court held that the statute was not violated because the statute was never intended to require expert driving proficiency. *Petersavage,* at 8. Such is the case here.

The negligence per se doctrine enables a court to give effect to a legislative enactment that establishes a standard of care more stringent than the common law standard of reasonableness. When a statutory "prohibition has been violated and the very evil aimed at by the law has been brought about, approval of the wrongdoer's conduct by the court is not consistent with proper respect for another branch of the government." 27 Harv. L. Rev. 317, 324 (1914). However, when a statute is construed without regard to its underlying purpose and then blindly applied to a private cause of action, the rationale of deferring to a coordinate branch of government is no longer viable. In that instance, the court is simply inventing its own standard of care. To ensure that we appropriately defer to the legislative branch and, at the same time, give effect to our common law principles of negligence, we apply a statutory

---

[2]This statute has been amended and recodified as RCW 46.61.110.

standard of care only after we engage in an analysis of the underlying statutory purpose. Here, after analyzing the purpose of the parking and stopping statute, we conclude that the doctrine of negligence per se was improperly applied. We, therefore, agree with the Court of Appeals decision reversing the jury verdict and remanding for a new trial.

We emphasize that our holding does not preclude Hofstrand from arguing on retrial that Mr. Mina was comparatively negligent. In the absence of a statutory standard, the jury is to measure a party's liability by the common law principles of negligence. *Gelling v. Golden Arrow Farms,* 39 Wn.2d 87, 92, 234 P.2d 539 (1951). Thus, Hofstrand is entitled to argue to the jury that Mr. Mina did not act reasonably after being hit by the Hofstrand truck.

Hofstrand also contests the Court of Appeals determination that retrial can be confined to the issue of the respective liabilities of the parties.

A new trial may be limited to certain issues where it clearly appears that the original issues were distinct and justice does not require resubmission of the entire case to the jury. *McCurdy v. Union Pac. R.R.,* 68 Wn.2d 457, 413 P.2d 617 (1966). If there is a possibility that the verdict was the result of a compromise, limiting retrial to certain issues is improper. *Myers v. Smith,* 51 Wn.2d 700, 321 P.2d 551 (1958). While compromise verdicts were a problem when contributory negligence was a complete defense, the possibility of compromise verdicts has been largely eliminated by the adoption of comparative negligence and the use of special verdict forms. *Crawford v. Miller,* 18 Wn. App. 151, 566 P.2d 1264 (1977).

In this case, the jury was properly instructed on damages and the special verdict form contained separate questions relating to liability and damages. Further, each party had an opportunity to present evidence on the damages question. On appeal, neither party has argued that the amount of damages was excessive or insufficient. *See France v. Peck,* 71 Wn.2d 592, 430 P.2d 513 (1967). Under these cir-

cumstances, a retrial limited to the issue of liability is appropriate.

We affirm the Court of Appeals decision, which reversed the jury verdict and remanded for a new trial limited to the issue of the parties' respective liabilities.

DORE, PEARSON, CALLOW, and GOODLOE, JJ., concur.

BRACHTENBACH, J. (dissenting)—A rear–end collision resulted in this lawsuit. The case was tried by competent counsel before an able trial judge. The jury sorted out factual conflicts and various legal theories advanced by the parties. The jury allocated 85 percent of fault to the plaintiffs. I would defer to the jury's determination and affirm the trial court; thus, I would reverse the Court of Appeals.

However, the majority affirms the Court of Appeals and remands for a new trial limited to liability.

The trial court correctly instructed the jury that a statute provides:

> Outside of incorporated cities and towns no person shall stop, park, or leave standing any vehicle, whether attended or unattended, upon the roadway.
> The above section shall not apply to the driver of any vehicle which is disabled in such manner and to such extent that it is impossible to avoid stopping and temporarily leaving the vehicle in such position.

The majority, by some insight unknown to me, states: "The purpose of the park and stop statute is to eliminate the hazard posed when drivers stop their vehicles on high speed freeways for other than emergency reasons." Majority, at 705. The paucity of the majority's reasoning is illustrated by a comparison of the language of the statute with the majority's conclusory statement of legislative intent. Nothing is said about high speed freeways.

The statute is not ambiguous. This court has no authority to impress upon a clear legislative declaration its idea of what it would prefer the statute to mean. Yet that is what the majority does.

The statute does not single out "high speed freeways." It

simply forbids any person, outside of incorporated cities and towns, to "stop, park, or leave standing any vehicle . . . upon the roadway." There is an escape section not factually applicable here.

Given the above recitation of the statute, did the evidence justify an instruction that the statute was applicable? The plaintiff's car was struck in the rear. The plaintiff driver closed his eyes and traveled almost a city block, and came to rest in the traveled lane of a freeway. The plaintiff driver could have stopped off the freeway. He had available to him a 12–foot–wide shoulder. He could have avoided being hit by defendant Hofstrand if he had paid attention to where he was. Arguably he violated the statute. Whether he should have or was excused from stopping on the highway was a jury question.

The majority states and premises its conclusion upon the fact that the plaintiffs' car was "out of control." What the majority omits is the fact that the car was totally operable, was being steered, was capable of being under control, but that the plaintiff driver *chose* to not have the car under control. It is a gross misstatement of the record to say that the car was out of control. What the majority fails to mention is that the experts agreed that the plaintiff's car was *driven* to its resting place on the freeway. The record is clear; there was no skidding, no braking, no effort to control the direction of the vehicle. That is a reasonable interpretation of the testimony, ignored by the majority and properly submitted to the jury.

In short, there was evidence that the plaintiff driver did not control his vehicle rather than that the vehicle was *beyond* his control. The jury's finding of 85 percent negligence on the plaintiff driver speaks more forcefully than my words. The majority's interpretation of the testimony simply fits its desired result.

At the time of trial the law was that violation of the statute would constitute negligence per se. *Johnson v. Heitman,* 88 Wash. 595, 598, 153 P. 331 (1915); *Young v. Caravan Corp.,* 99 Wn.2d 655, 663 P.2d 834, 672 P.2d 1267

(1983). In *Bauman v. Crawford,* 104 Wn.2d 241, 704 P.2d 1181 (1985), we changed that rule as to minors. The concurring opinion suggested that the per se doctrine should be reexamined in all tort cases (Brachtenbach, J., concurring at 249). Since such reexamination was not raised or briefed here, this is not the proper case to do so.

I would reverse the Court of Appeals and affirm the trial court.

DOLLIVER, C.J., and UTTER and ANDERSEN, JJ., concur with BRACHTENBACH, J.