[Nos. 55355–6, 55367–0. En Banc. October 26, 1989.]

ROBERT STEVE CHRISTEN, *Respondent,* v. VICTOR K. LEE, ET AL, *Petitioners.*

MATT LONG, ET AL, *Petitioners,* v. STEVEN KENNETH COATES, *Petitioner,* JOHN DOE BARD, ET AL, *Respondents.*

480

*Hackett, Beecher & Hart,* by *James Beecher* and *Theodore H. Millan,* and *Betts, Patterson & Mines, P.S.,* by *William P. Fite* and *Richard S. Lowell,* for petitioners Lee, et al.

*Edward F. Shea* and *Shea & Kuffel,* for petitioners Long.

*Horton, Wilkins & Faurholt,* by *William J. Connor,* for petitioner Coates.

*Burns, Schneiderman & Finkle, P.S.,* by *Warren L. Dewar, Jr.,* for respondent Christen.

*Raekes, Rettig, Osborne, Forgette & O'Donnell,* by *Brian J. Iller,* for respondents R.F. McDougall's, Inc., et al.

ANDERSEN, J.—

## FACTS OF CASES

These two consolidated cases concern the liability of a public drinking establishment for a *criminal assault* committed by one of its patrons. In neither case is the liability of the party who consumed the alcohol and committed the assault in issue.

### CHRISTEN V. LEE

Robert S. Christen arrived at the bar of the South China Doll Restaurant (China Doll) close to midnight in the evening of October 26, 1984. Christen drank at the bar until it closed approximately 2 hours later. He testified that when the bar was closing, he left the bar area to use the restroom in the lobby of the China Doll. He states that upon leaving the restroom, he headed back toward the bar, but was then confronted by three individuals, all apparently regular patrons of the China Doll with whom Christen was not previously acquainted. According to Christen, these individuals were screaming and laughing; they punched him; and one of them brandished a gun and told him to "get the hell out of here." Christen testified that he complied with their request to leave and that he was subsequently shot in the head on the walkway leading from the China Doll to the parking lot. He suffered serious injuries.

Christen's version of the night's events is corroborated to some extent by the testimony of Daniel Wiggins, a customer waiting for a take–out order in the lobby of the China Doll. Wiggins observed two men escorting Christen through the lobby, telling him to leave, when another man approached who appeared "ticked off" and sported a large bulge in his coat pocket. Next, according to Wiggins, this latter individual left the premises and the other two men proceeded to escort Christen out of the China Doll. Wiggins then heard a shot ring out. Wiggins further testified that

there were several employees of the China Doll in the lobby while all this was occurring, including two or three waitresses and a cashier.

Rebecca Markham, a cocktail waitress and bartender at the China Doll, testified that she too was aware of a commotion in the lobby. According to her, "[i]t looked like it was going to get heavy." She also states that Richard Oden, an armed and uniformed security guard at the China Doll, was aware of this commotion and he remarked that he thought there was going to be a fight.

The security guard did not intervene and claims he was unaware of any such confrontation. Three other China Doll employees (Harry Locke, Patty Lee, and Theresa Hendrickson) also testified that they were unaware of a confrontation in the lobby prior to the shooting.

Criminal charges were filed against one Rolando Visitacion in connection with the shooting. Visitacion was a regular patron of the China Doll and in attendance at the bar on the night of the shooting. Nothing in the record suggests that Visitacion had ever exhibited any vicious propensities while at the China Doll, including on the night in question, until the confrontation which is asserted to have occurred in the lobby when the bar was closing.

Two China Doll employees present on the night in question (Theresa Hendrickson and Patty Lee) suspected Visitacion of sometimes carrying a gun. Diane Thomas, a former employee of the China Doll, also testified that Visitacion carried a gun and that when she used to work there she had a practice of taking his gun and holding it for him in her purse behind the bar. Thomas states that on the night in question she was at the bar as a customer and that Visitacion relinquished his gun to her. She further testified that she returned the gun to him in the parking lot outside of the China Doll near closing time when she thought he was going home.

Diane Thomas also testified that she thought Visitacion was intoxicated while at the bar based on the amount of

alcohol she saw him consume. Nothing in the record, however, indicates that he actually appeared intoxicated to others around him.

Christen brought an action alleging negligence against the individuals doing business as the South China Doll Restaurant, the company under contract to provide security for the restaurant and the security guard on duty the night of the shooting. These latter parties, the petitioners herein, are for convenience hereinafter collectively referred to as the "China Doll". The China Doll moved for summary judgment in its favor and the Superior Court granted the motion. The Court of Appeals reversed the Superior Court. We granted the China Doll's petition for review.[1]

### LONG v. COATES

On September 15, 1984, Steven K. Coates, 20 years of age and home on leave from service in the Navy, spent the afternoon and part of the evening drinking beer with his friend, Dana Soderquist. Coates estimates that he personally consumed from 12 to 15 beers during this time. Later that evening, Coates and Soderquist entered R.F. McDougall's (McDougall's), a drinking establishment. The record indicates that while there, Coates was served several drinks of intoxicating liquor. Nothing in the record indicates that any effort was made to determine whether Coates was underage, and a waitress, Ann Straalsund, testified that Coates was "very drunk" while at McDougall's.

Coates claims to recall very little concerning the events of the evening in question. He did testify, however, that he might have shown a switchblade knife which he had recently purchased in Mexico to the bartender at McDougall's. Coates states that he may have done so because the knife was uncommon. The bartender was also a friend of his. Nonetheless, the record contains nothing which suggests that Coates exhibited any vicious propensities while at McDougall's.

---

[1]RAP 13.4.

Coates left McDougall's with Soderquist in Coates' mother's automobile around midnight. Matt Long, a Hanford patrolman, testified that the following events then transpired. Coates passed Long on the highway at a high rate of speed, Long at that time being off duty and on his way home. Shortly thereafter, Long observed Coates' vehicle strike another vehicle. The vehicle which Coates struck went off the road, but Coates continued on his way. Long pursued and caught up with Coates, and Coates then pulled off onto the shoulder of the road. Long and Coates exited their vehicles. Coates appeared confused and wandered back and forth from his car. After some discussion between them, Coates began walking back in the direction of the vehicle that he had struck. Long went with him. After awhile, Coates observed police lights at the scene of the accident and refused to proceed any further in that direction. They then headed back in the direction of their vehicles. On the way back, Coates tried to walk behind Long and Long, uncomfortable with this maneuver, started jogging toward his vehicle. Coates ran after Long and stabbed him twice in the back, causing serious injuries.[2]

Long, together with his wife and minor children, brought a negligence action against Coates, Coates' parents, the individuals doing business as R.F. McDougall's, and R.F. McDougall's, Inc. Again for the sake of convenience, the individuals doing business as R.F. McDougall's and R.F. McDougall's, Inc., are hereinafter collectively referred to as "McDougall's". Coates, in turn, filed a cross claim against McDougall's. McDougall's then moved for summary judgment in its favor; the Superior Court granted the motion, dismissing the claims made against McDougall's by the Longs. The Superior Court also dismissed the cross claims made by Coates to the extent that the cross claims sought recovery of damages arising out of Coates' stabbing of

---

[2]Coates' conduct on the evening in question resulted in a criminal assault conviction which was affirmed by this court in *State v. Coates,* 107 Wn.2d 882, 735 P.2d 64 (1987).

Long. The Court of Appeals affirmed the Superior Court. Both the Longs and Coates filed petitions for review which we granted.[3]

Four principal issues are presented by these two consolidated cases.

## ISSUES

ISSUE ONE. As concerns a cause of action for furnishing intoxicating liquor to an obviously intoxicated person, is evidence of the amount of alcohol consumed sufficient to get such a cause of action past a motion for summary judgment?

ISSUE TWO. Is a criminal assault a foreseeable result of furnishing intoxicating liquor to an obviously intoxicated person?

ISSUE THREE. Is a public drinking establishment that violates statutes prohibiting the sale of intoxicating liquor to a person who appears intoxicated, or who is a minor, per se liable for a criminal assault later committed by that person?

ISSUE FOUR. For purposes of summary judgment, is there sufficient evidence in the record that the China Doll is liable to Mr. Christen under its duty to supervise its premises?

## DECISION

ISSUE ONE.

CONCLUSION. Whether a person is obviously intoxicated or not is to be determined by the person's appearance to others around him or her at the time the intoxicating liquor is furnished to that person. Evidence of the amount of alcohol consumed is not sufficient by itself to establish that a person was furnished intoxicating liquor while obviously intoxicated. On the basis of the record before us, there is insufficient evidence to support a cause of action against the China Doll for furnishing intoxicating liquor to an obviously intoxicated person (Mr. Visitacion).

---

[3]RAP 13.4.

■ In the two cases here before us we are reviewing summary judgment orders. Summary judgment will be granted only where the pleadings, affidavits, depositions and admissions on file demonstrate that there is no genuine issue as to any material fact and the party bringing the motion is entitled to judgment as a matter of law.[4] The court will consider all facts and the reasonable inferences therefrom in the light most favorable to the nonmoving party.[5] Such a motion can be granted only if reasonable persons, from all of the evidence, could reach but one conclusion.[6]

■■ The essential elements of an action for negligence are: (1) the existence of a duty owed to the complaining party; (2) a breach of that duty; (3) a resulting injury; and (4) a proximate cause between the breach and the injury.[7] Under the common law of this state, a commercial purveyor of alcoholic beverages owes a duty not to furnish intoxicating liquor to a person who is obviously intoxicated.[8] In our recent decision in *Purchase v. Meyer*, 108 Wn.2d 220, 223, 737 P.2d 661 (1987), we held that "[w]hether a person is 'obviously intoxicated' or not is to be judged by that person's *appearance* at the time the intoxicating liquor is furnished to the person." (Italics ours.) Accordingly, neither the results of a blood alcohol test[9] nor the appearance of a person a substantial time after the intoxicating liquor was

---

[4]*Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982); *Barrie v. Hosts of Am., Inc.*, 94 Wn.2d 640, 642, 618 P.2d 96 (1980).

[5]*Wilson*, at 437; *Barrie*, at 642.

[6]*Wilson*, at 437; *Barrie*, at 642.

[7]*Pedroza v. Bryant*, 101 Wn.2d 226, 228, 677 P.2d 166 (1984); *Rikstad v. Holmberg*, 76 Wn.2d 265, 268, 456 P.2d 355 (1969).

[8]*Purchase v. Meyer*, 108 Wn.2d 220, 225, 737 P.2d 661 (1987); *Young v. Caravan Corp.*, 99 Wn.2d 655, 658, 663 P.2d 834, 672 P.2d 1267 (1983).

[9]*Purchase*, at 223; *Wilson*, at 439.

served[10] constitutes sufficient evidence of obvious intoxication.

In *Purchase,* we articulated several reasons why resort must be had to evidence of a person's appearance in order to determine whether that person was obviously intoxicated. First, we noted that a furnisher of intoxicating liquor ordinarily has no way of knowing how much alcohol a person has consumed before entering the establishment.[11] Next, we observed that a person who is a heavy drinker may be legally intoxicated yet still not appear intoxicated.[12] Finally, we explained that there are medically recognized variables in the way that alcohol may react on the human body.[13]

Going first to the Long case, a waitress at McDougall's testified that Mr. Coates was "very drunk" while there; McDougall's does not contend that there is insufficient evidence of obvious intoxication for this issue to get past a motion for summary judgment. In the Christen case, however, the China Doll does maintain there is insufficient evidence that Mr. Visitacion was obviously intoxicated while there. On review of the record as to this, we agree.

The only evidence arguably supporting the position that Mr. Visitacion was obviously intoxicated while at the China Doll is certain testimony by Diane Thomas, who socialized with Mr. Visitacion on the evening in question. It is her testimony that she thought Mr. Visitacion was intoxicated, but her conclusion was based solely on the amount of alcohol she saw him consume, not on his actual appearance.[14]

---

[10]*Purchase,* at 223.

[11]*Purchase,* at 225.

[12]*Purchase,* at 225–26.

[13]*Purchase,* at 226.

[14]The relevant portions of Diane Thomas' deposition testimony concerning the issue of obvious intoxication are as follows:
"Q. Do you think that [Visitacion] was under the influence of alcohol?
"A. Yes.
"Q. What do you base that on?

490

In fact, Ms. Thomas denied that Mr. Visitacion appeared intoxicated.[15] There is no evidence in the record to the effect that Mr. Visitacion actually appeared intoxicated to others around him. We conclude, therefore, that there is insufficient evidence to raise an issue of fact as to whether Mr. Visitacion was obviously intoxicated when served at the China Doll.

Mr. Christen, however, maintains that the case of *Dickinson v. Edwards,* 105 Wn.2d 457, 716 P.2d 814 (1986) mandates a contrary result. His reliance on that case is misplaced. It is true that in *Dickinson* a plurality of this court held that an admission by the person served that he had consumed between 15 and 20 drinks at the establishment therein was sufficient to raise a question of fact on the issue of obvious intoxication.[16] As we pointed out in our unanimous decision in *Purchase,* however, *Dickinson* was

"A. What do you mean?
"Q. Well, why do you think he was?
"A. *Anybody that has more than three drinks a night is under the influence of alcohol.*
". . . .
"Q. Patty [another employee] would know about [Visitacion] being intoxicated though, I take it.
"A. I guess.
"Q. I mean, that was fairly obvious, or was it?
"A. *No. He was not the type of person that you could actually sit there and look and say he was drunk.*
"Q. Unless you knew him?
"A. What I'm saying is it would be really be hard to look at him and say he was drunk. Because most of the time, if he got to the point he was really drunk, he would go out and get in his car and go to sleep.
"Q. You knew that he was intoxicated, is that because you know him pretty well?
"A. *That's because of the amount of alcohol you sit and watch somebody drink. That's not just from me seeing him and seeing like he's drunk and he's staggering or something like that. I'm going on the fact of the amount of alcohol he had consumed while we were there.*"

[15]See excerpts of Diane Thomas' deposition testimony set forth in the previous footnote.

[16]*Dickinson v. Edwards,* 105 Wn.2d 457, 465, 716 P.2d 814 (1986).

"factually unique".[17] And as we also explained in *Purchase,* a police officer in *Dickinson* had observed the person served to be in a "falling down drunk condition" just 10 minutes after that person had left the place where the intoxicating liquor was furnished.[18] No equivalent showing has been made in the case against the China Doll.

ISSUE TWO.

CONCLUSION. A *criminal assault* may be a foreseeable result of furnishing intoxicating liquor to an obviously intoxicated person, but only if the drinking establishment which furnished the intoxicating liquor had some notice of the possibility of harm from prior actions of the person causing the injury, either on the occasion of the injury or on previous occasions. A drinking establishment's awareness that a person possesses a knife does not by itself provide such notice; there must be some action on the part of that person indicating that he or she may actually use such a weapon. Based on the absence of anything in the record showing any such actions by Mr. Coates, McDougall's is not liable for damages arising out of Mr. Coates' later stabbing of Mr. Long based on any breach of McDougall's duty not to furnish intoxicating liquor to an obviously intoxicated person.

In Mr. Christen's case, there is insufficient evidence that the China Doll breached its duty not to furnish intoxicating liquor to an obviously intoxicated person. In Mr. Long's case, McDougall's does not contend that there is insufficient evidence that it breached its duty to not overserve Mr. Coates. Nonetheless, before liability can be imposed on McDougall's for the breach of that duty, it must also be established that the resulting harm was foreseeable.[19]

---

[17]*Purchase,* at 227. *See also Burkhart v. Harrod,* 110 Wn.2d 381, 392, 755 P.2d 759 (1988) (Utter, J., concurring).

[18]*Purchase,* at 227.

[19]*Bernethy v. Walt Failor's, Inc.,* 97 Wn.2d 929, 933, 653 P.2d 280 (1982); *Maltman v. Sauer,* 84 Wn.2d 975, 980–81, 530 P.2d 254 (1975); *Rikstad,* at 268–69; *Jones v. Leon,* 3 Wn. App. 916, 923, 478 P.2d 778 (1970), *review denied,* 78 Wn.2d 997 (1971).

██ ██ The concept of foreseeability limits the scope of the duty owed.[20] We have held that in order to establish foreseeability "the harm sustained must be reasonably perceived as being within the general field of danger covered by the specific duty owed by the defendant." *Maltman v. Sauer,* 84 Wn.2d 975, 981, 530 P.2d 254 (1975).[21] The limitation imposed thereby is important because, as this court has previously observed, "a negligent act should have some end to its legal consequences." *Hunsley v. Giard,* 87 Wn.2d 424, 435, 553 P.2d 1096 (1976). Foreseeability is normally an issue for the jury, but it will be decided as a matter of law where reasonable minds cannot differ.[22]

The harm involved in the case against McDougall's is the stabbing of Mr. Long by Mr. Coates as they were walking along the highway some distance from McDougall's. The general type of harm at issue in this case, therefore, is that of a criminal assault subsequent to Mr. Coates leaving McDougall's establishment. In some circumstances, an intervening act by a third party may be found to be foreseeable.[23] Whether or not an intervening act is criminal in nature bears on whether the act was foreseeable, but it does not necessarily preclude a finding of foreseeability.[24] This court has stated that an intervening act is not foreseeable if it is "so highly extraordinary or improbable as to be wholly beyond the range of expectability." *McLeod v. Grant Cy. Sch. Dist. 128,* 42 Wn.2d 316, 323, 255 P.2d 360 (1953). Thus, as we explained in the case of *Rikstad v. Holmberg,* 76 Wn.2d 265, 456 P.2d 355 (1969),

> It is not . . . the unusualness of the act that resulted in injury to plaintiff that is the test of foreseeability, but *whether*

---

[20]*Bernethy,* at 933; *Jones,* at 923.

[21]*See also Rikstad,* at 268–69.

[22]*Rikstad,* at 270; *Jones,* at 924.

[23]*McLeod v. Grant Cy. Sch. Dist. 128,* 42 Wn.2d 316, 320, 255 P.2d 360 (1953).

[24]*Bernethy,* at 934; *McLeod,* at 321.

*the result of the act is within the ambit of the hazards covered*
*by the duty imposed upon defendant.*

(Italics ours.) *Rikstad,* at 269.[25]

The past history in this state of the duty of one furnishing intoxicating liquors illuminates the proper present scope of this duty. Prior to 1955, this duty was governed by Washington's "dramshop act".[26] That act, the text of which is set forth in the margin,[27] gave an individual injured by an intoxicated person a civil cause of action against the one who furnished the intoxicating liquor. The early Washington case of *Woodring v. Jacobino,* 54 Wash. 504, 103 P. 809 (1909) demonstrates that potential liability under this statute was broad. In that case, a person became intoxicated after being sold intoxicating liquor at a drinking establishment, then assaulted another individual. The assailant was then killed when his victim defended himself. In an action based on the dramshop act, this court permitted the assailant's minor child to recover damages from the proprietor of the establishment which sold the liquor.[28] This state's dramshop act, on which that and other similar cases

---

[25]*See also Jones,* at 924.

[26]Laws of 1905, ch. 62, § 1, p. 120. *See Wilson v. Steinbach,* 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

[27]Washington's dramshop act provided in pertinent part as follows:

"Every husband, wife, child, parent, guardian, employe, or other person who shall be injured in person or property, or means of support, by any intoxicated person, or in consequence of the intoxication, habitual or otherwise, of any person, shall have a right of action, in his or her own name, severally or jointly, against any person or persons who shall, by selling or giving intoxicating liquors, have caused the intoxication of such person, for all damages sustained, and the same may be recovered in a civil action in any court of competent jurisdiction. On the trial of such action, the plaintiff or plaintiffs must prove that such intoxicating liquors were sold under circumstances sufficient to lead a man of ordinary intelligence to believe that such sale would probably result in intoxication." Laws of 1905, ch. 62, § 1, p. 120.

[28]*Woodring v. Jacobino,* 54 Wash. 504, 506, 103 P. 809 (1909).

were based, however, was repealed by the Legislature in 1955.[29]

■ Many states enacted such dramshop acts in order to afford a remedy where one was not generally afforded under the common law.[30] Under the common law,

> [I]t is not a tort to either sell or give intoxicating liquor to ordinary able–bodied men, and it has been frequently held that, in the absence of statute, there can be no cause of action against one furnishing liquor in favor of those injured by the intoxication of the person so furnished. . . . [T]he drinking of the liquor is the proximate cause of the injury, not the furnishing of it.

*Halvorson v. Birchfield Boiler, Inc.*, 76 Wn.2d 759, 762, 458 P.2d 897 (1969) (quoting 30 Am. Jur. *Intoxicating Liquors* § 520 (1958)). Following the repeal of Washington's dramshop act, this court followed the common law rule but recognized exceptions thereto for the furnishing of intoxicating liquor to a person who is obviously intoxicated, in a state of helplessness or in a special relationship to the furnisher of the intoxicants.[31]

This court has, however, repeatedly refused to broaden these exceptions. Recently, in the case of *Burkhart v. Harrod*, 110 Wn.2d 381, 383, 755 P.2d 759 (1988), we explained that these exceptions apply to commercial hosts and quasi–commercial hosts (those who do not sell alcohol but have a business interest in furnishing it to their guests), and declined to extend liability to purely social hosts. As we there explained in some detail, the Legislature is the appropriate body to address any such changes in the law.[32] In *Wilson v. Steinbach*, 98 Wn.2d 434, 441, 656 P.2d 1030

---

[29]Laws of 1955, ch. 372, § 1, p. 1538.

[30]Annot., *Liability of Innkeeper, Restaurateur, or Tavern Keeper for Injury Occurring on or About Premises to Guest or Patron by Person Other Than Proprietor or His Servant*, 70 A.L.R.2d 628, § 3, at 635–36 (1960).

[31]*Young v. Caravan Corp.*, 99 Wn.2d 655, 658, 663 P.2d 834, 672 P.2d 1267 (1983); *Wilson*, at 438.

[32]*Burkhart v. Harrod*, 110 Wn.2d 381, 385–86, 755 P.2d 759 (1988).

(1982), this court employed similar reasoning in declining to extend the recognized exceptions to impose a common law duty on a social host for furnishing intoxicating liquor to a minor. Further, in the case of *Shelby v. Keck,* 85 Wn.2d 911, 915–17, 541 P.2d 365 (1975), this court declined to alter the exceptions by removing the requirement that the furnisher of intoxicating liquor have notice that the person served was intoxicated or helpless. In so deciding, we stated very clearly:

> In effect, the plaintiff seeks to have this court adopt a theory of strict liability to be applied against one who furnishes liquor whenever a patron commits a tort while intoxicated. The rule proposed by the plaintiff amounts to a common–law "Dramshop Act" . . . to replace the statutory provision repealed by our legislature. We find this theory of recovery totally unacceptable.

(Citations omitted.) *Shelby,* at 915–16.

In sum, the history of the duty owed by a furnisher of intoxicating liquor in this state evinces a well considered and reasoned reluctance on the part of this court, in light of the Legislature's repeal of this state's dramshop act, to now judicially decree common law liability in cases other than those fitting within the well–recognized exceptions to the common law rule.

 The postdramshop act cases of this court addressing the duty not to furnish intoxicating liquor to an obviously intoxicated person commonly involve automobile accidents.[33] In such cases, the plaintiff seeks recovery directly from the one who furnished intoxicating liquor to the person causing the accident.[34] It follows that the general type of harm encompassed by this duty is that of alcohol–induced driver error.[35] Driver error is a commonly understood and foreseeable consequence of serving intoxicants to

---

[33]*See, e.g., Young,* at 657; *Wilson,* at 436.

[34]*See, e.g., Young,* at 657; *Wilson,* at 436.

[35]*See Burkhart,* at 395 (Utter, J., concurring).

an already obviously intoxicated person.[36] The type of harm involved in the two cases before us, however, is that of a *criminal assault*. This is a drastically different type of harm than driver error. While driver error is not an intentional act, a criminal assault is an intentional act.[37] Thus, the nature of the harm in the cases before us is not within the general field of danger traditionally covered by the duty not to furnish intoxicating liquor to an obviously intoxicated person.[38]

There are, however, cases which do impose liability on a drinking establishment for a criminal assault committed by one of its patrons.[39] Such cases are not, however, based solely on a breach of the duty not to furnish intoxicating liquor to an obviously intoxicated person. Rather, in such cases

> the courts attach considerable weight to the fact that [the] proprietor of the establishment . . . had some *notice of the possibility of harm from prior actions of the person causing the injury,* either on the occasion of the injury, or on previous occasions.

(Italics ours.) Annot., *Liability of Innkeeper, Restaurateur, or Tavern Keeper for Injury Occurring on or About Premises to Guest or Patron by Person Other Than Proprietor or His Servant,* 70 A.L.R.2d 628, § 18, at 657 (1960).[40]

---

[36]*See Burkhart,* at 395–96 (Utter, J., concurring).

[37]*See Welch v. Railroad Crossing, Inc.,* 488 N.E.2d 383, 390 (Ind. Ct. App. 1986). We need not here speculate on when an assault is or is not an "intentional" act for purposes of a criminal action. It is sufficient for our purposes that according to the record before us in this *civil* action, it is *uncontroverted* that Mr. Coates *ran after* Mr. Long and stabbed him *twice* in the back.

[38]*See Welch,* at 390; *Hebert v. Club 37 Bar,* 145 Ariz. 351, 701 P.2d 847 (Ct. App. 1984).

[39]*Waldron v. Hammond,* 71 Wn.2d 361, 428 P.2d 589 (1967); Annot., *Tavernkeeper's Liability to Patron for Third Person's Assault,* 43 A.L.R.4th 281 (1986); Annot., 70 A.L.R.2d 628.

[40]*See also Welch,* at 388; Annot., 43 A.L.R.4th 281, § 2(a), at 289.

The cases addressing the liability of a drinking establishment for a criminal assault by one of its patrons typically involve the establishment's duty to properly supervise its premises, rather than, or perhaps in addition to, its duty concerning the furnishing of intoxicating liquor.[41] The premises duty of a drinking establishment requires that it exercise reasonable care to protect its patrons from harm at the hands of other patrons.[42] Washington cases recognize this duty and have adhered to the above notice rule.

This court's decision in *Moore v. Mayfair Tavern, Inc.,* 75 Wn.2d 401, 451 P.2d 669 (1969) is illustrative of our approach in such cases. In *Moore,* a drinking establishment's patron started a fight with another patron and was subsequently ejected by the bartender. Shortly thereafter, the ejected patron returned to the establishment with a gun and shot the patron he had earlier accosted. The victim sued the establishment, alleging negligence in not ejecting the offending patron sooner. This court declined to impose liability on the establishment, reasoning that

[w]hile there was evidence that [the assailant] had been noisy and profane, *there was no evidence that [the assailant] had said or done anything which would serve as a warning that he was likely to commit such an act.*

(Italics ours.) *Moore,* at 405. Similarly, in *Potter v. Madison Tavern,* 74 Wn.2d 704, 708, 446 P.2d 320 (1968), this court, in holding that the drinking establishment therein could not be held liable for a criminal assault committed by one of its patrons, found significant the fact that the offending patron "was not known by the tavern management personnel to be of a vicious temperament." There are a number of other cases to this same effect.[43]

---

[41]Annot., 43 A.L.R.4th 281, § 2(a), at 288.

[42]*Shelby v. Keck,* 85 Wn.2d 911, 914, 541 P.2d 365 (1975); *Waldron,* at 363.

[43]*See Waldron v. Hammond, supra* (tavern keeper liable where assailant had previously struck another patron); *Hayes v. Far West Servs., Inc.,* 50 Wn. App. 505, 749 P.2d 178 (in considering doctrine of respondeat superior, employee not negligent where, among other things, he had no notice that his drinking would

Accordingly, we hold that a criminal assault is not a foreseeable result of furnishing intoxicating liquor to an obviously intoxicated person, unless the drinking establishment which furnished the intoxicating liquor had some notice of the possibility of harm from prior actions of the person causing the injury, either on the occasion of the injury, or on previous occasions.[44]

Turning now to the facts in the record before us, we find no evidence of any actions on the part of Mr. Coates, either on the night in question or on previous occasions, that would have provided McDougall's with notice of the possibility of harm. The assertion has been made, however, that Mr. Coates may have shown a switchblade knife to his friend, the bartender at McDougall's, and that this would provide McDougall's with the requisite notice of the possibility of harm. We disagree. A recent Illinois decision, *Getson v. Edifice Lounge, Inc.*, 117 Ill. App. 3d 707, 453 N.E.2d 131, *review denied*, 96 Ill. 2d 559 (1983), rejected a similar contention on grounds that- we find persuasive. *Getson* involved a stabbing by a member of a motorcycle gang who carried a buck knife on his belt. The court in that case stated that it could find no evidence that the drinking establishment therein had ever seen the assailant cause trouble, or that it otherwise knew him to be a troublemaker.[45] It then concluded:

> We cannot say as a matter of law that someone who is a member of a motorcycle group and who happens to carry a buck knife is *per se* dangerous. *There must be evidence of actions of [the assailant] of which [the drinking establishment] was*

cause him to become violent), *review denied*, 110 Wn.2d 1031 (1988); *Jones v. Leon*, 3 Wn. App. 916, 925, 478 P.2d 778 (1970) (drinking establishment not liable where there was no evidence that it "had knowledge of any propensity of [the assailant] to use a gun"), *review denied*, 78 Wn.2d 997 (1971).

[44]Annot., 70 A.L.R.2d 628, § 18, at 657.

[45]*Getson v. Edifice Lounge, Inc.*, 117 Ill. App. 3d 707, 712, 453 N.E.2d 131, *review denied*, 96 Ill. 2d 559 (1983).

*aware, or should have been aware, which would have com-pelled a reasonably prudent person to conclude that it was likely [the assailant] might endanger an invitee.*

(Second italics ours.) *Getson,* 117 Ill. App. 3d at 712. In that case, the court held that the drinking establishment was not liable for the assault.[46]

That case, *Getson,* was recently followed in the Indiana decision of *Welch v. Railroad Crossing, Inc.,* 488 N.E.2d 383 (Ind. Ct. App. 1986). In *Welch,* the court held that a drinking establishment was not liable for an assault com-mitted by a patron who also wore a knife on his belt. Rely-ing on *Getson,* the Indiana court reasoned that

on the night in question, [the assailant] exhibited *no behavior* that suggested he was likely to use the knife as he did; he did not remove the knife from its carrier while in the bar and he made no threats to anyone. Moreover, [the assailant] had been in the [drinking establishment] many times, but had never exhibited any violent tendencies. . . . In short, [the assailant's] assault was as unforeseeable, unexpected, and spontaneous as it was barbaric.

*Welch,* at 389.

We further observe that this court's decision in *Bernethy v. Walt Failor's, Inc.,* 97 Wn.2d 929, 653 P.2d 280 (1982) is not to the contrary. In *Bernethy,* this court declined to shield a gun shop from liability for providing a rifle and ammunition to an intoxicated person who shot his estranged wife shortly upon leaving the store. The imposi-tion of a duty in that case was based on the policy against furnishing a dangerous instrumentality to an incompe-tent.[47] The distinction between accommodating an intoxi-cated person who wishes to purchase a weapon, as in *Ber-nethy,* and serving alcohol to someone like Mr. Coates who already happens to have one is obvious. Unlike *Bernethy,* the suit against McDougall's is not one involving the well-established doctrine of negligent entrustment.

---

[46]*Getson,* 117 Ill. App. 3d at 713.

[47]*Bernethy v. Walt Failor's, Inc.,* 97 Wn.2d 929, 933, 653 P.2d 280 (1982).

■ We thus conclude that any knowledge by McDougall's that Mr. Coates was carrying a knife was insufficient to provide McDougall's with notice of the possibility of harm that ultimately ensued here. We observe in that connection that there is no evidence in the record that Mr. Coates displayed the knife in a threatening manner. Rather, it was Mr. Coates' testimony that the bartender at McDougall's was a friend of his and that he may have shown the knife to him as a unique item which he had recently acquired in Mexico. Although not critical to our decision, it also bears note that the criminal assault involved in this action against McDougall's occurred away from its premises and well beyond its control. As we have already observed, the cases addressing the liability of a drinking establishment for a criminal assault by one of its patrons primarily involve a drinking establishment's duty to properly supervise its premises. Here, however, Mr. Coates stabbed Mr. Long along the side of a highway after he had already driven away from the premises and after he had been involved in an accident with a third party not involved in the assault.

There being no evidence of any actions on the part of Mr. Coates that would put McDougall's on notice of the possibility of this harm, and the assault having occurred away from the premises, we conclude that his stabbing of Mr. Long along the highway would not be a foreseeable result of furnishing intoxicating liquor to him while he was obviously intoxicated. As a matter of law, therefore, McDougall's is not liable for damages arising out of Mr. Coates' subsequent stabbing of Mr. Long based on its asserted breach of this duty.

An additional assertion is made that McDougall's should be liable under the common law for breaching a duty not to serve intoxicating liquor to a minor and for failing to prevent an obviously intoxicated person from leaving the establishment premises. We initially note that such duties are not explicitly included in our usual formulation of the

exceptions to the common law rule of nonliability.[48] Of more importance, however, is that even were we to conclude that these duties do exist under the common law, for the reasons set forth in the foregoing analysis we would further conclude that the criminal assault by Mr. Coates against Mr. Long was not a foreseeable consequence of any breach thereof.

ISSUE THREE.

CONCLUSION. For cases filed before August 1, 1986, the court may hold a party to be negligent per se for violating the standards of conduct set forth in a legislative enactment, if, among other things, the enactment is intended to protect against the particular hazard from which the harm results. The statutes prohibiting the sale of intoxicating liquor to one who appears intoxicated or who is a minor are not intended to protect against the particular hazard of a subsequent criminal assault. Thus, McDougall's is not negligent per se for violating such statutes by furnishing intoxicating liquor to Mr. Coates.

The record before us contains evidence that McDougall's did serve intoxicating liquor to Mr. Coates when he was obviously intoxicated. This is expressly prohibited by the Washington State liquor act (RCW Title 66), which provides:

> No person shall sell any liquor to any person apparently under the influence of liquor.

RCW 66.44.200. When he was served at McDougall's, Mr. Coates was also a minor, in the sense that he was under 21 years of age. This too is prohibited by the state act:

> Every person who shall sell any intoxicating liquor to any minor shall be guilty of a violation of Title 66 RCW.

RCW 66.44.320.[49]

Both the Longs and Mr. Coates assert that McDougall's was negligent per se for violating the statutes just cited.

---

[48]See Young v. Caravan Corp., 99 Wn.2d 655, 658, 663 P.2d 834, 672 P.2d 1267 (1983); Wilson v. Steinbach, 98 Wn.2d 434, 438, 656 P.2d 1030 (1982).

[49]See also RCW 26.28.080; RCW 66.44.270.

The Legislature has enacted a statute abolishing most negligence per se actions,[50] but that statute applies only to cases filed on or after August 1, 1986.[51] The case against McDougall's having been filed prior to that date, however, we address this assertion, but conclude that McDougall's was not negligent per se for having served Mr. Coates. Our reasons are as follows.

█ The standard of conduct required of a reasonable person may be prescribed by legislative enactment.[52] In determining whether the violation of a statute constitutes negligence per se, we must first, however, ascertain whether the underlying purpose of the statute pertains to the conduct at issue.[53] If it is determined that the underlying purpose of the statute was violated, then we must decide whether, as a matter of policy, the statutory standard should apply in the instant case.[54] In both of these inquiries, we are guided by the Restatement (Second) of Torts § 286 (1965):[55]

> The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part
> (a) to protect a class of persons which includes the one whose interest is invaded, and
> (b) to protect the particular interest which is invaded, and
> (c) to protect that interest against the kind of harm which has resulted, and

---

[50]RCW 5.40.050; *Purchase v. Meyer,* 108 Wn.2d 220, 229, 737 P.2d 661 (1987).

[51]Laws of 1986, ch. 305, § 910, p. 1367; *Purchase,* at 229.

[52]*Young,* at 659; W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* § 36 (5th ed. 1984).

[53]*Adkins v. Aluminum Co. of Am.,* 110 Wn.2d 128, 145, 750 P.2d 1257 (1988); *Mina v. Boise Cascade Corp.,* 104 Wn.2d 696, 704, 710 P.2d 184 (1985).

[54]*Adkins,* at 145; *Mina,* at 704.

[55]*Adkins,* at 145; *Mina,* at 704.

(d) *to protect that interest against the particular hazard from which the harm results.*

(Italics ours.) Restatement (Second) of Torts § 286 (1965).

▆▆▆▆ To reiterate, the particular hazard involved in the case against McDougall's is that of a criminal assault committed by Mr. Coates when he stabbed Mr. Long as they were walking along a highway following an automobile collision which in no way involved the victim of the assault, Mr. Long. In the foregoing discussion of the scope of the common law duty not to furnish intoxicating liquor to an obviously intoxicated person, we concluded that the general field of danger covered by this duty is that of driver error in causing automobile accidents. We further concluded that a criminal assault is not foreseeable solely from a breach of this particular duty. As we perceive it, in enacting the statute against furnishing intoxicating liquor to a person who appears intoxicated, the Legislature intended to protect against foreseeable hazards resulting therefrom. We conclude that said statute was not intended to protect against the hazard of a subsequent criminal assault.

Concerning the statute against furnishing intoxicating liquor to a minor, the courts of this state have held that a violation of this proscription can constitute negligence per se.[56] These cases, however, also involve automobile accidents.[57] Furthermore, we have previously accepted the prevention of driver error as the obvious and legitimate purpose behind legislation establishing 21 as the legal drinking age.[58] Thus, we likewise conclude that the general field of danger covered by this statutory duty is that of driver error and that a criminal assault is not a foreseeable

---

[56]*Purchase v. Meyer, supra; Young v. Caravan Corp., supra; Baughn v. Malone,* 33 Wn. App. 592, 656 P.2d 1118 (1983); *Callan v. O'Neil,* 20 Wn. App. 32, 578 P.2d 890 (1978).

[57]*See, e.g., Purchase,* at 222; *Young,* at 657.

[58]*See Houser v. State,* 85 Wn.2d 803, 808, 540 P.2d 412 (1975), *overruled on other grounds in State v. Smith,* 93 Wn.2d 329, 610 P.2d 869 (1980).

result from a violation thereof. Again, we perceive the Legislature as intending to protect against foreseeable hazards and conclude, therefore, that the sale to minors statute was not intended to protect against the particular hazard of a subsequent criminal assault by the consumer of the alcohol.

We also question whether, as a matter of policy, liability should attach to McDougall's in this case for a violation of these statutes. This case involves a subsequent criminal assault committed without any warning. To permit recovery under such circumstances would greatly extend the liability imposed on a furnisher of intoxicating liquor. Such broad liability may well be appropriate under a dramshop act,[59] but as we have already pointed out, the Legislature in the exercise of its judgment repealed this state's dramshop act in 1955.[60] This strongly suggests that it does not intend that statutes such as those here at issue serve as vehicles for imposing such liability.[61]

We hold, therefore, that McDougall's cannot be held liable under the theory that it is negligent per se based on the statutory violations herein claimed.

ISSUE FOUR.

CONCLUSION. A drinking establishment may be held liable under its duty to exercise reasonable care to protect its patrons from harm at the hands of other patrons if it fails to intervene in an assault as soon as reasonably possible. There is sufficient evidence in the record before us to enable Mr. Christen to avoid summary judgment on the issue of whether the China Doll is liable to him under its premises duty by not having timely intervened in a confrontation between Mr. Christen and three other patrons in the lobby of the China Doll.

---

[59]See *Woodring v. Jacobino*, 54 Wash. 504, 103 P. 809 (1909).

[60]Laws of 1955, ch. 372, § 1, p. 1538.

[61]See *Burkhart v. Harrod*, 110 Wn.2d 381, 387–88, 755 P.2d 759 (1988).

 This court has held that

the keeper of an establishment wherein intoxicating liquors are dispensed, while not an insurer of the safety of his patrons, owes the duty to his patrons to exercise reasonable care and vigilance to protect them from reasonably foreseeable injury, mistreatment or annoyance at the hands of other patrons.

*Waldron v. Hammond,* 71 Wn.2d 361, 363, 428 P.2d 589 (1967).[62] This is the duty of a drinking establishment to properly supervise its premises.[63] In Mr. Long's case, he was not a patron of McDougall's and was not, therefore, owed this premises duty. In Mr. Christen's case, however, Mr. Christen was a patron of the China Doll and was owed this duty. We agree with Mr. Christen's argument that there is sufficient evidence in the record, for purposes of the summary judgment motion against him, that the China Doll is liable pursuant to its premises duty.

A drinking establishment may be held liable under its premises duty for a criminal assault by one of its patrons.[64] In order for a drinking establishment to be subject to such liability, however, the assault must have been reasonably foreseeable.[65] In many cases where a criminal assault is found to have been foreseeable, the drinking establishment had failed to eject a patron whose prior actions provided it with notice of the possibility of harm.[66] The China Doll cannot be held liable under its premises duty for failing to eject Mr. Visitacion because there is no evidence in the record that Mr. Visitacion acted in a manner that would

---

[62] *See also Shelby v. Keck,* 85 Wn.2d 911, 914, 541 P.2d 365 (1975) (quoting *Waldron*).

[63] Annot., 43 A.L.R.4th 281, § 2(a), at 288 (1986).

[64] *See Waldron v. Hammond,* 71 Wn.2d 361, 428 P.2d 589 (1967).

[65] *Waldron,* at 363; Annot., 43 A.L.R.4th 281, § 2(a), at 289.

[66] *See Moore v. Mayfair Tavern, Inc.,* 75 Wn.2d 401, 405, 451 P.2d 669 (1969); *Waldron,* at 363; Annot., 43 A.L.R.4th 281, §§ 3, 4; Annot., 70 A.L.R.2d 628, § 18, at 657 (1960).

provide such notice to the China Doll prior to the confrontation in the lobby and the shooting just outside the premises. As already discussed, the fact that the China Doll may have been aware that Mr. Visitacion possessed a gun does not by itself provide the required notice. Rather, there must have been some conduct on the part of Mr. Visitacion indicating that he might actually use the gun. Based on the record before us, there was no such conduct.

The harm of a criminal assault is also foreseeable, however, if the drinking establishment failed to intervene in an assault situation as soon as reasonably possible. In the case of *Miller v. Staton*, 58 Wn.2d 879, 365 P.2d 333 (1961), a patron of a drinking establishment was injured when she was knocked down by two other patrons engaged in a fight. This court held in that case that there was sufficient evidence to hold the drinking establishment liable to the injured patron.[67] As the court there reasoned,

the jury was entitled to conclude that, by the exercise of reasonable care for the safety of their patrons, the defendants in the operation of their tavern knew or should have known a fight was ensuing in time to have stopped the fight thereby avoiding the resulting injuries sustained by the plaintiff.

*Miller*, at 883. More recently, in the case of *Manzanares v. Playhouse Corp.*, 25 Wn. App. 905, 611 P.2d 797 (1980), the Court of Appeals found sufficient evidence to hold a drinking establishment liable for damages where there was evidence that its bouncer permitted the assailant to approach the plaintiff in a tense situation;[68] in short, that the bouncer failed to timely intervene. Similarly, cases in other jurisdictions also support the imposition of liability where the drinking establishment fails to intervene in an assault as soon as reasonably possible.[69]

---

[67]*Miller v. Staton*, 58 Wn.2d 879, 883, 365 P.2d 333 (1961).

[68]*Manzanares v. Playhouse Corp.*, 25 Wn. App. 905, 908–09, 611 P.2d 797 (1980).

[69]Annot., 43 A.L.R.4th 281, § 7 (cases cited therein).

Viewing the evidence in the light most favorable to Mr. Christen, as we must, we conclude that there was sufficient evidence to survive the China Doll's motion for summary judgment based on the China Doll's premises duty to intervene in a confrontation which culminated in Mr. Christen's being shot. Mr. Christen testified as follows: that he was approached in the lobby by three individuals; that they were screaming and laughing; that they punched him; and that one of them held a gun and told him to "get the hell out of here". Daniel Wiggins, a customer waiting in the lobby for a take–out order, testified that two individuals escorted Mr. Christen toward the door and that a third man approached them who appeared "ticked off" and who had a large bulge in his coat pocket. He further stated that there were several employees in the lobby at that time. A China Doll bartender, Rebecca Markham, said that she heard and saw a commotion in the lobby and that "[i]t looked like it was going to get heavy." She also stated that the security guard, Richard Oden, watched this incident and even remarked that he thought there was going to be a fight. The security guard, by his own account of the night's events, did not intervene in a confrontation. The record further indicates that Mr. Christen was then shot just after he left the China Doll.

The China Doll, however, maintains that any such failure to intervene was not the proximate cause of Mr. Christen's injuries. The doctrine of proximate cause in Washington entails the two elements of cause in fact and legal causation.[70] Cause in fact refers to the "but for" consequences of an act; it is the physical connection between an act and an injury.[71] Cause in fact is generally a question for the jury, but it may become a question of law for the court when the facts are undisputed and the inferences

---

[70]*Baughn v. Honda Motor Co.*, 107 Wn.2d 127, 142, 727 P.2d 655 (1986); *Hartley v. State*, 103 Wn.2d 768, 777, 698 P.2d 77 (1985).

[71]*Baughn*, at 142; *Hartley*, at 778.

therefrom are plain and incapable of reasonable doubt or difference of opinion.[72]

The legal causation prong of proximate cause involves policy considerations of how far the consequences of a defendant's acts should extend.[73] It concerns whether liability *should* attach as a matter of law given the existence of cause in fact.[74]

The China Doll maintains that any failure to intervene was not the cause in fact of Mr. Christen's injuries because the only action it could have taken would have been to separate the patrons involved and insure that each left separately. It further argues that this action would have been of no consequence because the evidence indicates that these individuals did leave separately. The China Doll argues that Mr. Christen, therefore, would still have been shot upon leaving the premises despite any attempts to intervene. We disagree. Again, viewing the evidence in the light most favorable to Mr. Christen, a trier of fact could reasonably infer that intervention by an armed and uniformed security guard could have defused the confrontation, or that the guard could also have detained Mr. Visitacion and the other two individuals long enough to permit Mr. Christen to safely depart the premises.

 As to the legal causation prong of proximate cause, we perceive no policy reason why liability should not potentially attach to the China Doll based on a breach of its duty to intervene in the confrontation that is asserted to have occurred. The duty of a drinking establishment to intervene in a developing assault as soon as reasonably possible is well supported by case law.[75]

---

[72]*Baughn,* at 142; *Bernethy v. Walt Failor's, Inc.,* 97 Wn.2d 929, 935, 653 P.2d 280 (1982).

[73]*Baughn,* at 146; *Hartley,* at 779.

[74]*Baughn,* at 146; *Hartley,* at 779.

[75]*See Miller,* at 883; *Manzanares,* at 908–09; Annot., 43 A.L.R.4th 281, § 7(a).

 The China Doll further maintains, however, that its premises duty does not extend to actions that take place outside the building housing the China Doll. Here Mr. Christen was shot on the walkway between the China Doll and its parking lot, but not inside the China Doll itself. It is true that the duty of a drinking establishment to protect its patrons does not extend to harm occurring away from its premises.[76] As a general rule, however, courts do not refrain from imposing liability for injuries because they were inflicted in a drinking establishment's parking lot or on the steps leading to or from the establishment.[77] Whatever the limitations on this rule may be,[78] such a rule is appropriate where, as here, there is evidence that the shooting was related to a confrontation that actually began inside the drinking establishment and continued out onto the adjacent walkway.

We thus conclude that sufficient evidence was presented to survive the China Doll's motion for summary judgment on liability based on the China Doll's potential liability to Mr. Christen under its premises duty to exercise reasonable care to protect its patrons from harm at the hands of other patrons.

Finally, we address the contention that the trial court also erred by not granting Mr. Christen's motion for a continuance of the summary judgment hearing. Mr. Christen sought a continuance in order to depose Mr. Visitacion and to obtain a sworn statement from an expert witness. It was his expressed hope to elicit testimony from Mr. Visitacion concerning the amount of alcohol he had consumed and his

---

[76]*See Johnson v. Martin,* 28 Wn. App. 774, 775, 626 P.2d 525 (1981) (drinking establishment not liable where assault occurred several minutes after the victim left the establishment). *See also Moore,* at 403 (drinking establishment not required to make assailant drive away where there was insufficient evidence that the parking lot was under its control).

[77]Annot., 43 A.L.R.4th 281, § 2(a), at 289.

[78]*See Moore,* at 403.

version of the asserted confrontation in the lobby,[79] and to obtain sworn testimony from an expert witness concerning the adequacy of security at the China Doll.[80] Since we have held that evidence of the amount of alcohol consumed is not sufficient by itself to raise an issue of fact on the obvious intoxication question, and that there is sufficient evidence in the record to hold the China Doll liable under its premises duty, Mr. Christen's reasons for seeking a continuance are not pertinent. Further review of the trial court's discretionary order is unwarranted.

The decision of the Court of Appeals reversing the trial court's order granting the China Doll's motion for summary judgment on liability is affirmed insofar as it concerns the legal theory that the China Doll may be liable under its premises duty. The decision of the Court of Appeals is reversed, however, insofar as it holds that the China Doll may be liable under its duty to not furnish intoxicating liquor to an obviously intoxicated person; as to this issue, the trial court properly granted the China Doll's motion for summary judgment.

We also affirm the decision of the Court of Appeals which affirmed the trial court's order granting McDougall's motion for summary judgment on liability. McDougall's is not liable for damages arising out of Mr. Coates' stabbing of Mr. Long under any of the theories presented.

CALLOW, C.J., BRACHTENBACH, DOLLIVER, PEARSON, DURHAM, and SMITH, JJ., and HAMILTON, J. Pro Tem., concur.

UTTER, J. (concurring in part, dissenting in part)—I concur in the majority's resolution of the Christen case; the record lacks sufficient evidence to raise an issue of fact regarding obvious intoxication. In the Long case, however, I find the majority's approach to tort law untenable. It unnecessarily narrows liability for serving an obviously

---

[79]Brief of Appellant, at 18.

[80]Clerk's Papers, at 79.

intoxicated person which is not required by the facts or the law.

Neither the majority nor McDougall's claims there is insufficient evidence that the latter breached its duty to not overserve Mr. Coates. Majority, at 491. The only issue is whether the "foreseeability" principle limits the scope of McDougall's liability. As the majority correctly points out, foreseeability is an issue for the jury unless reasonable minds cannot differ. Majority, at 492; see *Bernethy v. Walt Failor's, Inc.*, 97 Wn.2d 929, 933, 653 P.2d 280 (1982); *Rikstad v. Holmberg*, 76 Wn.2d 265, 270, 456 P.2d 355 (1969). Instead of relegating the current issue to the jury, the majority holds, as a matter of law, that it is not foreseeable that an overserved, obviously intoxicated minor patron might use a switchblade knife he had previously shown to the bartender.[81] Following the *Rikstad* case, decided by this court, I would send that issue to the jury.

In *Rikstad,* an intoxicated driver had driven his pickup truck over an intoxicated man who had passed out in the grass beside a campsite. The trial court had held, as a matter of law, that a reasonable man could not have foreseen that a person would be lying in the grass. *Rikstad,* at 265. In reversing, this court explained that it is not the unusual sequence of events in any given case but the general field of danger that affects liability. The court found that "reasonable minds can well differ" on whether the injury was within the foreseeable scope of risks arising from the driver's duty to operate his truck in a reasonable manner. Quoting precedent, this court emphasized that "*it is for the jury to decide whether the general field of danger should*

---

[81]In the lower courts, the parties disputed whether there was sufficient evidence that Coates actually showed the knife to the bartender. In a summary judgment action, this court, like the trial court, independently reviews all evidence presented. *Yakima Fruit & Cold Storage Co. v. Central Heating & Plumbing Co.,* 81 Wn.2d 528, 530, 503 P.2d 108 (1972). Nonetheless, the majority and both lower courts considered the issue immaterial to the legal analysis. It becomes material only if it makes a difference whether the bartender saw the knife. For the purpose of refuting the majority's analysis, I discuss only the legal issue.

*have been anticipated . . . [by defendant].*" (Italics mine.) *Rikstad,* at 270 (quoting *McLeod v. Grant Cy. Sch. Dist. 128,* 42 Wn.2d 316, 324, 255 P.2d 360 (1953)).

The majority's attempt to limit the jury's function is unpersuasive. The main thrust of the argument focuses on the court's recent trend to foreclose the development of tort law in this area. Because the court has never ruled on this issue before, the majority argues, it should decline to find potential liability. See majority, at 494–95.

Other courts have properly recognized two principles. First, repeal of a strict liability dramshop act leaves fundamental principles of negligence unimpaired. *Rappaport v. Nichols,* 31 N.J. 188, 156 A.2d 1, 8 (1959). To hold otherwise provides an unwarranted measure of immunity for tavern owners and other furnishers of alcohol. *See McClellan v. Tottenhoff,* 666 P.2d 408, 412 (Wyo. 1983); *see also Ontiveros v. Borak,* 136 Ariz. 500, 667 P.2d 200, 205 (1983). Second, it is the court's duty to develop the common law consistent with the needs of a changing society:

> The genius of the common law is that it is constantly expanding to meet new and unique conditions. The spirit of the common law is not dead. . . .

*Colligan v. Cousar,* 38 Ill. App. 2d 392, 414, 187 N.E.2d 292, 302 (1963). "When the ghosts of the past stand in the path of justice, clanking their medieval chains, the proper course for the judge is to pass through them undeterred." *United Austl., Ltd. v. Barclays Bank, Ltd.,* [1940] 4 All E.R. 20, 37 (H.L.), *quoted in El Chico Corp. v. Poole,* 732 S.W.2d 306, 315 (Tex. 1987).

In support of narrowing the duty to not overserve an obviously intoxicated person, the majority cites *Burkhart v. Harrod,* 110 Wn.2d 381, 755 P.2d 759 (1988), *Wilson v. Steinbach,* 98 Wn.2d 434, 656 P.2d 1030 (1982), and *Shelby v. Keck,* 85 Wn.2d 911, 541 P.2d 365 (1975).

Both *Burkhart* and *Wilson* involved the question of social host liability and are not, therefore, controlling. In *Burkhart,* in addition, all opinions agreed the facts did not

indicate that Burkhart was obviously intoxicated. Therefore, the defendants did not breach a duty not to serve obviously intoxicated persons. The majority's remarks concerning social host liability were therefore mere dicta. Dicta cannot serve as precedent for the resolution of the instant case. Moreover, the majority's position received scathing criticism:

> [T]he *Burkhart* court not only failed to articulate a convincing rationale for failing to recognize such a duty but also declined to fulfill its proper role in defining the norms of responsible social behavior.

Recent Cases, *Negligence—Social Host Liability—Social Hosts Not Liable for Accidents Caused by Intoxicated Guests.—Burkhart v. Harrod, 110 Wash. 2d 381, 755 P.2d 759 (1988),* 102 Harv. L. Rev. 549 (1988) (hereafter *Recent Cases*).

As stated in my concurring opinion in *Burkhart,* if the facts showed obvious intoxication, I would find, applying ordinary principles of negligence, that a social host has a duty to take reasonable measures to prevent an intoxicated guest from driving on public roads when the host has furnished an obviously intoxicated guest with alcohol. *Burkhart,* at 394 (Utter, J., concurring).

Many of the principles discussed in my *Burkhart* concurrence apply equally here. Courts have a responsibility to fine tune the common law to be more just. The "deferential posture adopted by the *Burkhart* court . . . amounts to an abdication of judicial responsibility." *Recent Cases,* at 555. As a public policy issue, courts consider imposing liability to provide incentive to avoid the loss altogether. W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* § 4, at 25 (5th ed. 1984) (hereafter *Prosser and Keeton*). The drinking establishment, not the assault victim, is in a better position to avoid the loss by refusing service.

The next inquiry, then, involves applying negligence principles, beginning with duty limited by foreseeability. In *Burkhart,* I stated that "beyond question" a traffic accident

is a foreseeable result of "mixing gasoline and liquor". *Burkhart,* at 395 (Utter, J., concurring). In contrast, here I do not find that a criminal assault is "beyond question" a foreseeable result of mixing alcohol and weapons. Rather, I find it an issue about which reasonable minds can differ. Therefore, it is a question for the jury. *Shelby v. Keck, supra,* relied on by the majority, does not support a contrary position. *Shelby* merely requires that principles of negligence, not strict liability, apply.

In *Shelby,* the plaintiff sought to recover for the wrongful death of her husband who was accidentally shot by a tavern patron. She alleged the tavern owner was negligent in two respects: first, for serving liquor to a man when the tavern owner knew or should have known that the man was carrying a loaded weapon; and second, for permitting Keck to become intoxicated. *Shelby,* at 915. In resolving the first issue, this court affirmed a directed verdict in favor of the defendant. The plaintiff failed to present sufficient evidence that "would alert a reasonable man in the defendant's position that Keck was likely to be armed and thereby posed a threat to the safety of his other patrons . . ." *Shelby,* at 915. None of the tavern employees knew the patron was armed. By inference, the carrying of a weapon might be sufficient to provide notice of an enhanced risk to others. The court found no liability on the second charge because there was no evidence that Keck was obviously intoxicated.

I do not dispute the majority's contention that *Shelby* requires notice of risk. The majority, however, holds that prior aggressive acts of an armed patron are the exclusive means of providing notice of increased risk to others. Majority, at 491. By so holding, the majority unnecessarily narrows the concept of notice. The Supreme Court of Florida, resolving a premises duty case such as those relied on by the majority, specifically rejected the majority's position: "specific knowledge of an individual's dangerous propensities is *not* the exclusive method of proving foreseeability." (Italics mine.) *Allen v. Babrab, Inc.,* 438 So. 2d 356, 357

(Fla. 1983) (foreseeability of assault may be shown by proving that the proprietor, based on the establishment's history, "should have recognized the likelihood of disorderly conduct by third persons in general"). In a more recent case, that court elaborated by stating that the indicia listed for providing notice of general or specific harm were not exclusive. *Hall v. Billy Jack's, Inc.,* 458 So. 2d 760, 762 (Fla. 1984); *see also Kerby v. Flamingo Club, Inc.,* 35 Colo. App. 127, 532 P.2d 975, 978 (1975).[82]

Moreover, in the premises duty cases relied on by the majority, at 497–98, this court did not hold as a matter of law that a tavern owner is not liable absent notice provided by acts of the patron. In *Moore v. Mayfair Tavern, Inc.,* 75 Wn.2d 401, 407, 451 P.2d 669 (1969), this court addressed whether the *jury* was justified in finding that the assault was not foreseeable. *Moore,* at 405–06. Similarly, in *Potter v. Madison Tavern,* 74 Wn.2d 704, 446 P.2d 320 (1968), we considered whether a case fully tried to a court without a jury should be overturned on appeal. *Potter,* at 704. In neither case did this court say, as a matter of law, that criminal assaults are not foreseeable absent notice provided by previous conduct. In both cases the court merely considered whether there was sufficient evidence to uphold either the jury's or the trial court's findings. As in *Moore,* the present question should be an issue for the jury.

Furthermore, cases involving a premises duty do not and should not resolve the question of foreseeability for the duty not to overserve. In those cases, not only is there no requirement that the assailant be obviously intoxicated, there is no requirement that the drinking establishment ever served him at all. Where the drinking establishment has not created the risk, as it would in breaching a duty not to overserve, this court has required and should require

---

[82]Colorado's Dramshop Act applied only to serving habitual drunkards when the server had received notice that the patron was a habitual drunkard. *See* Note, *Crespin v. Largo Corporation and the Legislative Response: The Turbulent State of Dram Shop Liability in Colorado,* 57 U. Colo. L. Rev. 419, 420 n.10 (1986). The complaint in *Kerby* alleged three theories of recovery based on negligence.

more in the way of notice of future problems. *See Moore,* at 407 (patron consumed two schooners and part of a third, slapped another patron, was ejected from the tavern, returned with a gun and shot the other patron); *Jones v. Leon,* 3 Wn. App. 916, 478 P.2d 778 (1970) (assailant entered the bar, ordered no drinks, and shot his girl friend's dancing partner), *review denied,* 78 Wn.2d 997 (1971); *Potter,* at 705 (trial court found as an unchallenged fact that the patron was not intoxicated); *see also Getson v. Edifice Lounge, Inc.,* 117 Ill. App. 3d 707, 453 N.E.2d 131 (no discussion of intoxication, in fact evidence conflicts whether the lounge served the assailant at all), *review denied,* 96 Ill. 2d 559 (1983). It is the combination of factors that leads to foreseeability, not any one factor in isolation. Because *Welch v. Railroad Crossing, Inc.,* 488 N.E.2d 383 (Ind. Ct. App. 1986), ignores this consideration, I find that analysis unpersuasive.

Examining underlying principles of supplier liability clarifies both the question and its resolution. In *Bernethy v. Walt Failor's, Inc.,* 97 Wn.2d 929, 653 P.2d 280 (1982), this court ruled that owners of a gun shop could be found negligent, under the theory of negligent entrustment, for selling a gun to an intoxicated man who immediately returned to a tavern to kill a person. The majority rejects using *Bernethy* by analogy, finding no implication of the doctrine of negligent entrustment. Majority, at 499. *Prosser and Keeton,* however, have grouped such cases together in discussing the liability of suppliers:

> [A] seller who delivers a dangerous thing to one whom he should know to be unfit to handle it has been held liable for the harm which results to others—as where, for example, a gun is sold to a child, or an automobile to a known incompetent driver. There are by now a good many cases of so-called "common law dramshop" liability, in which a seller has been held liable to third parties for the sale of intoxicating liquor to a minor, or to an intoxicated person. It is the negligent entrusting which creates the unreasonable risk; and this is none the less when the goods are conveyed. . . .

(Footnotes omitted.) *Prosser and Keeton* § 104, at 718. Other jurisdictions have also recognized the similarity of principle. *See, e.g., McClellan v. Tottenhoff,* 666 P.2d 408, 415 (Wyo. 1983); *El Chico Corp. v. Poole,* 732 S.W.2d 306, 312 (Tex. 1987); *Ontiveros v. Borak,* 136 Ariz. 500, 667 P.2d 200, 207 (1983); *Alegria v. Payonk,* 101 Idaho 617, 619 P.2d 135, 138 (1980) ("The 'negligent entrustment' tort . . . is a recognition of the risk of injury which exists when two ingredients are combined . . ."); *Rappaport,* 153 A.2d at 7.

Although there is a difference between providing a weapon to an obviously intoxicated person and providing additional liquor to an obviously intoxicated person who already has a weapon, similar principles undergird a policy of finding potential liability for both. While hard documentation of the relationship of alcohol and violence is incomplete, statistics and logic suggest a causal connection.

According to statistics available in 1981, alcohol was involved in about 10,000 murders annually. Panel on Alternative Policies Affecting the Prevention of Alcohol Abuse and Alcoholism, National Research Council, *Alcohol and Public Policy: Beyond the Shadow of Prohibition* 82 (1981). The panel noted the absence of pharmacological studies substantiating a physiological connection between alcohol and violence but, nonetheless, concluded a causal relationship exists:

> Nevertheless, even without a pharmacological connection, there is a strong causal connection between alcohol and violence: the culture tells people this is so, and in acting on this belief they make it come true. Research designed to sort out the specific quantitative contribution of cultural belief to alcohol–involved violence is in its infancy, but this connection requires consideration even in the absence of good epidemiological estimates.

*Alcohol and Public Policy,* at 83.

A study guide prepared for the Department of Justice discussed the relationship between drinking and crime:

> Alcohol abuse is one of the Nation's gravest health and social problems. It is also one of its most serious crime problems. . . .
> . . . .

There is a close relationship between alcohol and crime, and there is good reason to believe that consumption of alcohol causes crime. The most obvious crimes in which alcohol plays a role are drunk driving and public drunkenness, *but alcohol is also a factor in large percentages of violent crime and intra-family crime.*

. . . .

. . . Alcohol also plays a major role in violent crime. In Marvin Wolfgang's classic study of homicide in Philadelphia, he found that the killer, the victim, or both were drunk in more than half the cases. That finding seems also to apply to rapes. Needless to say, many aggravated assaults involve alcohol; indeed, a large number occur in taverns or among drinking companions. Alcohol also plays a prominent role in crimes within the family. A high percentage of wife beatings, child abuse, and child sexual abuse are committed by men who are drunk. Recent research sponsored by the National Institute of Justice found that a majority of new prison inmates had severe alcohol problems.

That so large a percentage of perpetrators of serious crimes drink heavily beforehand does not prove that alcohol causes crime. People may first decide to commit their crimes and then get drunk to muster courage or allay fears. For some violent offenders heavy drinking *and* [emphasis in original] savage behavior are both symptoms of deep psychological problems. *Still the relationship between drinking and violence is not subtle or difficult to understand. It is common knowledge and scientifically demonstrable that alcohol releases inhibitions and distorts judgment.* The "fighting drunk" is a regular member of tavern culture . . .

(Italics mine.) U.S. Dep't of Justice, *Drinking and Crime* (1983).

Even a cursory review of the literature reveals numerous publications that either provide statistics demonstrating an alcohol–crime relationship or present attempts to explain the relationship. *See, e.g.,* R. O'Brien & M. Chafetz, *Encyclopedia of Alcoholism* (1982) (evidence of alcohol use has been reported in 24 percent to 72 percent of assailants in assault cases); Weston, *Alcohol's Impact on Man's Activities: Its Role in Unnatural Death,* 74 Am. J. Clinical Pathology 755, 757 (1980) (Table 5 indicates that 72 percent of all stabbings in the United States are alcohol related); Temple & Ladouceur, *The Alcohol–Crime Relationship as an Age–Specific Phenomenon: A Longitudinal*

*Study,* 13 Contemp. Drug Probs. 89 (Spring 1986) (suggesting an indirect relationship between crime and alcohol during adolescence that diminishes with age); Collins, *Alcohol Use and Criminal Behavior: An Empirical, Theoretical, and Methodological Overview,* in *Drinking and Crime* 288, 289 (1981) (finding a significantly strong alcohol–assaultive crime empirical association to justify the inference that sometimes alcohol and serious crime are causally related).

We must not lose sight of the central issue—the issue is foreseeability. There is no need for a detailed socio–psychological–pharmacological understanding of the alcohol–crime relationship. All that is necessary is to acknowledge that there is some relationship, a relationship recognized by laymen. Historically, laymen have recognized a relationship. The pre–prohibition era, an era not focused on alcohol–vehicle accidents, provides voluminous material. In denouncing intemperance as "the great source of crime," one criminal lawyer of the 1880's quoted numerous literati:

> Man, with raging drink inflamed,
> Is far more savage and untamed;
> Supplies his loss of wit and sense
> With barbarousness and insolence.

A. Richmond, *Leaves from the Diary of an Old Lawyer: Intemperance, the Great Source of Crime* 28 (1880) (quoting Hudibras).

Courts also have recognized a connection between alcohol and aggression. "Alcohol plays a major role in the incidence of death and injuries on our highways, the battered women's syndrome, and assaults and batteries in taverns, on the streets and in the home." *Clendening v. Shipton,* 149 Cal. App. 3d 191, 198, 196 Cal. Rptr. 654, 658 (1983) (finding foreseeability of assault a jury question in a case filed before statutory revision); *see also Carey v. New Yorker of Worcester, Inc.,* 355 Mass. 450, 245 N.E.2d 420, 422 (1969); *Terry v. Markoff,* 26 Ohio App. 3d 20, 497 N.E.2d 1133, 1135 (1986) (finding a commercial provider of

alcoholic beverages can be liable for assault, under a negligence theory, when it overserves an obviously intoxicated patron).

Nonetheless, the majority affirms the Court of Appeals decision, holding that reasonable minds cannot find that a stabbing is a foreseeable result of overserving an obviously intoxicated minor possessing a switchblade. Prosser's guidance bears repeating: "As the gravity of the possible harm increases, the apparent likelihood of its occurrence need be correspondingly less to generate a duty of precaution." *Prosser and Keeton* § 31, at 171. In Long, I would reverse and remand for trial.