178 P.3d 358 (2008)
Bianca FAUST, individually and as Guardian of Gary C. Faust, a minor, and Bianca Celestine Mele, Bryan Mele, Beverly Mele, and Albert Mele, Respondents,
v.
Mark ALBERTSON, as personal Administrator for the Estate of Hawkeye Kinkaid, deceased, Loyal Order of Moose, Inc., Moose International, Inc., John Does (1-10) (fictitious names of unknown individuals and/or entities) and ABC Corporation (1-10) (fictitious names of unknown individuals and/or entities), Defendants,
Bellingham Lodge # 493, Alexis Chapman, Appellants.
Nos. 57821-9-I, 57321-7-I, 57320-9-I.
Court of Appeals of Washington, Division 1.
January 7, 2008.
Publication Ordered February 14, 2008.
*360 Steven John Chance, Attorney at Law, Bellingham, WA, Philip Albert Talmadge, Talmadge Law Group PLLC, Tukwila, WA, for Appellants.
William Edward Fitzharris Jr., Preg O'Donnell & Gillett PLLC, Russell Charles Love, Thorsrud Cane & Paulich, Seattle, WA, Edward M. Kay, Paul V. Esposito, Clausen Miller, Chicago, IL, Charles Kenneth Wiggins, Wiggins & Masters PLLC, Bainbridge Island, WA, for Respondents.
APPELWICK, C.J.
¶ 1 After they were injured when their vehicle was struck by a drunk driver, the Fausts brought suit against the estate of the driver, who was killed in the accident. They also sued Alexis Chapman, bartender at the Moose Lodge and the Lodge itself for overservice of alcohol. The jury returned a verdict for the Fausts. Chapman and Moose Lodge appeal. The Fausts cross-appeal contending that the interest rate on tort judgments violates their constitutional right to equal protection. Liability for overservice of alcohol requires that the consumer appear under the influence at the time of service. The evidence does not support overservice. We reverse and vacate the judgment against Chapman and the Moose Lodge, and deny the cross-appeal.

Facts
¶ 2 At approximately 7:45 p.m. on April 21, 2000, while driving southbound down LaBounty Road in Ferndale, Hawkeye Kinkaid's[1] van wandered across the center line and struck a northbound vehicle head-on. The car held the Faust family. Bianca Faust was driving the car which also contained her children, Bianca Celestine Mele and Gary *361 Christopher Faust, and her infant granddaughter. Bianca Faust suffered a broken kneecap and other injuries. Bianca Mele broke both of her wrists and a femur and also received lacerations and a knee injury. Of the car passengers, Christopher suffered the most serious injuries resulting in paraplegia. Kinkaid sustained severe injuries resulting in massive bleeding that required administration of significant amounts of fluid to replace the lost blood. He later died at the hospital.
¶ 3 One hour after the accident, toxicology showed that Kinkaid's blood alcohol content (BAC) was .16 percent, significantly above the legal limit of .08 percent.[2] At autopsy, Kinkaid's BAC was .09 percent after losing significant amounts of blood and receiving large quantities of fluids. The medical examiner also explained that Kinkaid's stomach contents included 1.5 liters of liquid that smelled strongly of alcohol. This alcohol had not yet been absorbed into his bloodstream and was therefore not reflected in the BAC analyses. The Fausts' forensic science consultant estimated that at the time of the accident, Kinkaid's BAC was approximately .32 percent. In order to achieve this level, the expert calculated that Kinkaid needed to consume twenty-one 12-ounce containers of beer or 30 ounces of 80-proof alcohol.
¶ 4 On the evening of the accident, Kinkaid had been at the Moose Lodge in Bellingham where his girlfriend, Alexis Chapman, was the bartender. The Faust family filed suit against Hawkeye Kinkaid's estate, the Bellingham Moose Lodge, Moose International, Inc., and Chapman as employee and bartender at the Moose Lodge in Bellingham. The suit alleged that Kinkaid negligently injured the Fausts, that the Moose Lodge and Chapman overserved alcohol to Kinkaid, that the Lodge negligently hired and supervised Chapman, and that Moose International failed to adequately monitor the Lodge and Chapman. Moose International was dismissed from the case during trial. The parties stipulated to a judgment against Kinkaid's estate.
¶ 5 Testimony showed that Kinkaid and Chapman arrived at the Lodge at about 4:30 p.m. According to Chapman who had spent the afternoon with Kinkaid, he was sober upon arrival at the Lodge. Chapman testified that she only served Kinkaid two beers. Members of the Lodge who remembered seeing Kinkaid at the Lodge that night testified that he appeared sober. The parties dispute the time of Kinkaid's departure from the Lodge. The Fausts presented evidence that he left the bar around 7:30 p.m. including Chapman's original statement to an investigator. Other witnesses testified that Kinkaid left around 6 p.m. Two witnesses testified that they had seen Kinkaid drinking a beer at a bowling alley after 6 p.m. but the bartender at that establishment stated that Kinkaid had not been in the bar that night.
¶ 6 A jury returned a verdict for the Fausts and awarded significant damages, totaling approximately 14 million dollars. In apportioning negligence among the defendants, the jury attributed 50 percent to Kinkaid, 15 percent to Chapman, and 35 percent to the Moose Lodge. The Moose Lodge and Chapman (collectively the Lodge) appeal.

Discussion
I. Overservice of Alcohol
A. Requirements for Liability for Overservice of Alcohol
¶ 7 The Moose Lodge and Chapman moved for a judgment as a matter of law during and after trial and also moved for a new trial based on insufficiency of evidence as to overserving.
[A] challenge to the sufficiency of the evidence, or a motion for nonsuit, dismissal, directed verdict, new trial, or judgment notwithstanding the verdict, admits the truth of the opponent's evidence and all inferences which can reasonably be drawn therefrom, and requires that the evidence be interpreted most strongly against the *362 moving party and in a light most favorable to the opponent.
Davis v. Early Constr. Co., 63 Wash.2d 252, 254, 386 P.2d 958 (1963). In reviewing a ruling on a motion for a judgment as a matter of law we engage in the same inquiry as the trial court. Stiley v. Block, 130 Wash.2d 486, 504, 925 P.2d 194 (1996). A judgment as a matter of law requires the court to conclude as a matter of law, "that there is no substantial evidence or reasonable inferences to sustain a verdict for the nonmoving party." Indus. Indem. Co. v. Kallevig, 114 Wash.2d 907, 915-16, 792 P.2d 520 (1990). However, the court must "defer to the trier of fact on issues involving conflicting testimony, credibility of the witnesses, and the persuasiveness of the evidence." State v. Hernandez, 85 Wash.App. 672, 675, 935 P.2d 623 (1997). Overturning a jury verdict is only appropriate when the verdict is clearly unsupported by substantial evidence. Burnside v. Simpson Paper Co., 123 Wash.2d 93, 107, 108, 864 P.2d 937 (1994). Because the standards of review and issues are the same, this section will discuss whether the trial court erred in its denial of both motions for judgment as a matter of law and the motion for a new trial.
¶ 8 Civil liability for overservice of alcohol arises from the fact that "a commercial host has a statutory duty to refrain from serving persons `apparently under the influence of liquor.'" Barrett v. Lucky Seven Saloon, Inc., 152 Wash.2d 259, 273, 96 P.3d 386 (2004). "This duty is a limited exception to the general rule that it is not a tort to sell alcohol to `ordinary able-bodied men' on the theory that it is the drinking of the alcohol that is the proximate cause of any injury, not the furnishing of it." Dickerson v. Chadwell, Inc., 62 Wash.App. 426, 434, 814 P.2d 687 (1991). The exception arises because, "[o]nly when a commercial establishment furnishes liquor to one `in such a state of helplessness or debauchery as to be deprived of his will power or responsibility for his behavior', does applicability of this proximate cause rationale cease." Id. (quoting Halvorson v. Birchfield Boiler, Inc., 76 Wash.2d 759, 762, 458 P.2d 897 (1969)).[3] Thus, the duty only applies to service of alcohol to those already exhibiting manifestations of the effect of alcohol.
¶ 9 Moose Lodge contends that the Fausts needed to provide direct, observational evidence that Kinkaid was "apparently under the influence" at the time Chapman served him. The Fausts disagree, claiming that blood alcohol evidence can prove that a person is apparently under the influence of alcohol. The Washington Supreme Court has indicated its concern "that blood alcohol content be used only as evidence of intoxication at the time of the accident and not as evidence of the obviousness of intoxication at the time of alcohol service." Dickinson v. Edwards, 105 Wash.2d 457, 463, 716 P.2d 814 (1986). As a result, of this concern, the court determined that "[w]hen the obviousness of intoxication is at issue, firsthand observations and other circumstances from which such obviousness can be inferred are most valuable to the court." Id. "Whether a person is `obviously intoxicated' or not is to be determined by the person's appearance to others around him or her at the time the intoxicating liquor is furnished to that person." Christen v. Lee, 113 Wash.2d 479, 487, 780 P.2d 1307 (1989).
¶ 10 Despite these clear pronouncements, the court has permitted cases to go forward from summary judgment based on direct observation evidence of obvious intoxication at the time of the accident, rather than service, See, Dickinson, 105 Wash.2d at 464, 716 P.2d 814; Fairbanks v. J.B. McLoughlin Co., 131 Wash.2d 96, 929 P.2d 433 (1997). In Dickinson, the court considered statements of the investigating officer who observed the defendant's behavior a mere 10 minutes after the conclusion of a banquet where he had consumed 15 to 20 drinks in three and a half hours. Id. at 464-465, 716 P.2d 814. The court reversed the summary judgment because *363 "subjective observations of obvious intoxication made in close time proximity to the period of alcohol consumption may raise an inference of obvious intoxication upon which to base a material question of fact." Dickinson, 105 Wash.2d at 464, 716 P.2d 814. Similarly, in Fairbanks, a police officer's firsthand observations of the defendant's slurred speech and staggering raised an inference about her intoxication when served since she did not consume alcohol after leaving the premises and no time remained unaccounted for between consumption of the beverages and the observation. 131 Wash.2d at 103, 929 P.2d 433.
¶ 11 Such inferences create fact evidence of over consumption that raise issues of material fact as to a defendant's condition upon service sufficient to defeat summary judgment. But, the Supreme Court has limited the use of this post-consumption evidence to factually unique cases involving "very close time proximity of service of alcohol to when the driver was seen obviously intoxicated following the accident." Purchase v. Meyer, 108 Wash.2d 220, 227-28, 737 P.2d 661 (1987). The inferences are not sufficient to prove the statutory standard of service to someone "apparently under the influence of liquor," nor to allow consideration of other corroborating evidence, like BAC. Cases lacking observational evidence have not survived summary judgment. See, Purchase, 108 Wash.2d at 226, 737 P.2d 661 (results of observations of behavior and BAC taken hours after service of alcohol did not establish overservice when nothing in the record suggested defendant appeared intoxicated at the bar); Christen, 113 Wash.2d at 488-89, 780 P.2d 1307 ("neither the results of a blood alcohol test nor the appearance of a person a substantial time after the intoxicating liquor was served constitutes sufficient evidence of obvious intoxication.") Absent observational evidence that the drinker appeared under the influence of alcohol when served, a plaintiff cannot establish overservice by a preponderance of the evidence. Where this observational evidence is lacking, directed verdict is appropriate. Evidence of appearance of intoxication at the time of the subsequent accident, including BAC, cannot be considered in the absence of evidence of appearance of being under the influence at the time of service. BAC is merely relevant to enhance the credibility of observations about the defendant's condition at the time of service. Cox v. Keg Restaurants, U.S., Inc., 86 Wash.App. 239, 250, 935 P.2d 1377 (1997.)
¶ 12 The current statutory standard is "apparently under the influence of liquor." "[A]pparently under the influence of liquor" means "seemingly" drunk, as opposed to the higher standard of "unmistakably" or "certainly" drunk. Barrett, 152 Wash.2d at 264, 96 P.3d 386. "`Evidence of the amount of alcohol consumed is not sufficient by itself to establish that a person was furnished intoxicating liquor while [apparently under the influence].'" Id. at 279, 96 P.3d 386 (quoting Christen 113 Wash.2d at 489, 780 P.2d 1307). Thus to meet the legal standard, the plaintiffs needed to present evidence concerning whether Kinkaid was "seemingly" drunk at the time Chapman served him alcoholic beverages. If evidence does not show that Kinkaid appeared intoxicated to those around him, the evidence is insufficient to raise an issue of fact as to overservice. Christen, 113 Wash.2d at 490, 780 P.2d 1307.
B. Evidence Presented at Trial
¶ 13 The trial court denied the motions for judgment as a matter of law and new trial. In its post-trial ruling the trial court stated:
In this case, the court's previous ruling that the statements of Alexis Chapman, the bartender at the Moose Lodge, was sufficient evidence of behavior evidencing that Hawkeye Kincaid was apparently under the influence of liquor reflects the determination by the court that the person serving the alcohol directly to Kincaid, who has a personal knowledge of him and his behavior, is well placed to observe those behaviors. Those statements provide sufficient evidence to take the case to the jury for determination as to liability.
According to the trial court, the statements Chapman made to Rainy Kinkaid, Hawkeye Kinkaid's daughter, and Lisa Johnston provided adequate evidence. "In these statements, it was declared that Hawkeye Kincaid *364 had too much to drink or was drunk, shouldn't have been driving, and should have been cut off from further service. It is for the jury, then, to decide from these statements whether or not the last service of alcohol, based on the bartender's familiarity with Hawkeye Kincaid, was over-service." The court also found the "evidence of Hawkeye Kincaid's blood alcohol level was not the sole evidence on which the jury's decision is based, but merely supporting evidence." However, the trial court did admit that "[w]ithout the statements of the bartender Chapman, Defendants' motion would be granted." Based on this statement, the trial court relied heavily on the testimony of Rainy and Lisa Johnston about Chapman's comments in order to deny the motions for a defense verdict.
¶ 14 Rainy testified that Chapman admitted to her that Kinkaid was drunk.
A: That he was at the bar, and they were having an argument or not getting along or however you want to say it, and pretty much either she kicked him out or didn't want him there or told him to leave.
Q: And did she describe his condition when she told him to leave?
A: Yeah, she knew that he was tipsy, that he shouldn't be behind the wheel.
Q: What did she say to you?
A: She said that he had too much to drink, and shouldn't be driving.
Rainy also testified that Chapman made similar comments at a later date.
Q: [T]he second time that she talked to you, did she again indicate what his condition was when he left the Moose Lodge?
A: Yes.
Q: And what did she tell you the second time?
A: That he had been drinking for quite awhile.
Q: And what did she say in terms of his ability to operate a vehicle?
A: Drunk.
While Rainy's testimony appears damning for Chapman, the questions center on Kinkaid's condition when he left the Lodge. The statute does not impose liability for allowing a drunken patron to leave the premises regardless of whether he is cut off, thrown out or leaves voluntarily. Rainy's testimony about Chapman's admissions do not show that she served Kinkaid when he was "apparently under the influence of liquor," only that he was intoxicated upon his departure. The statements do not fix Chapman's perception of Kinkaid's condition at the appropriate time to establish liability for overservice.
¶ 15 Similarly, Johnston's testimony about Chapman's statements does not establish Kinkaid's appearance to others around him at the time of service. Chapman apparently revealed that Kinkaid had been drunk to Johnston, a friend of Kinkaid and bouncer at the bar where Chapman had been employed as a bartender.
Q: [D]id you ever talk to her about what happened that evening?
A: Yes.
Q: What did she tell you?
A: She said that Hawkeye was sitting at the bar and he was being obnoxious and that he was drunk, and she cut him off and he got mad.
Q: And then what happened after she cut him off and he got mad?
A: He left. . . .
Q: And you're certain, though, that she did tell you that he  she knew he was drunk?
A: Yes.
Once again, this testimony shows Kinkaid's condition after he had consumed alcohol, not when Chapman served the beverages. The statements provide no insight into whether Kinkaid had been "apparently" under the influence when he was served. Instead, the testimony describes Kinkaid's drunken condition after he had been drinking. Nothing says he was drunk when he got there, so that any service would have been overservice. In addition, the statements support responsible behavior by Chapman  she cut him off when he became drunk and obnoxious. This suggests that Chapman recognized signs of drunkenness and refused to serve him, as required by law.
*365 ¶ 16 The evidence relied upon by the trial court to deny a defense verdict does not appear to meet the standard required for liability based on a claim of overservice. This liability requires specific point-in-time evidence establishing "that person's appearance at the time the intoxicating liquor is furnished to the person." Purchase, 108 Wash.2d at 223, 737 P.2d 661. Here, both Rainy and Johnston testified that Chapman admitted that Kinkaid was drunk when he left the Moose Lodge. This does not prove overservice. The trial court erred by relying on Chapman's statements, as related by Rainy and Johnston, as sufficient evidence to forestall a directed verdict. This evidence is not sufficient to establish Kinkaid's appearance at the time of service of alcohol. Because "[t]he purpose of this provision is to protect against foreseeable hazards resulting from service to an intoxicated person," the duty only applies to the service of alcohol to those already exhibiting signs of the influence of alcohol. Dickerson, 62 Wash.App. at 435, 814 P.2d 687. The Lodge cannot be held liable when a patron is not "apparently under the influence" when served. As long as Chapman did not serve Kinkaid after he "appeared" under the influence, neither she, nor the Lodge, are liable for the Fausts' injuries. Since, no evidence describes Kinkaid's state when Chapman served him, substantial evidence does not support the jury verdict against Moose Lodge and Chapman for overservice.
¶ 17 We reverse verdict against the Lodge and Chapman on liability for overservice. As a result, we must also reverse the negligent hiring/supervision claim against the Lodge since it is based on Chapman's negligent overservice. The verdict and judgment against the estate of Hawkeye Kinkaid remains.
II. Constitutionality of RCW 4.56.110(3)
¶ 18 The Fausts requested and received a 6.002 percent interest rate on their judgment. They agree that this interest rate is consistent with RCW 4.56.110(3) which awards interest on tort judgments at
two percentage points above the equivalent coupon issue yield, as published by the board of governors of the federal reserve system, of the average bill rate for twenty-six week treasury bills as determined at the first bill market auction conducted during the calendar month immediately preceding the date of entry.
For the first time on appeal, the Fausts challenge the constitutionality of RCW 4.56.110(3) because the statute applies a different rate of interest to tort judgments than other judgments. They base the challenge on both federal and state equal protection grounds.
¶ 19 Under both the federal and state constitutions, "[t]he right to equal protection guarantees that persons similarly situated with respect to a legitimate purpose of the law receive like treatment." State v. Harner, 153 Wash.2d 228, 235, 103 P.3d 738 (2004). The Fausts contend the judgment interest statute violates equal protection because it punitively applies a lower interest rate to tort judgments than contract or child support judgments. However, "[a] statute is presumed to be constitutional, and the party challenging its constitutionality bears the burden of proving its unconstitutionality beyond a reasonable doubt." State v. Thorne, 129 Wash.2d 736, 769-770, 921 P.2d 514 (1996). The parties agree that the statute is subject to rational basis review. "[U]nder the rational basis standard the law must be rationally related to a legitimate state interest, and will be upheld unless the classification rests on grounds wholly irrelevant to the achievement of a legitimate state objective." DeYoung v. Providence Med. Ctr., 136 Wash.2d 136, 144, 960 P.2d 919, (1998). This "`[standard] is the most relaxed and tolerant form of judicial scrutiny under the equal protection clause.'" Id. (quoting State v. Heiskell, 129 Wash.2d 113, 124, 916 P.2d 366 (1996)).
¶ 20 Both parties cite to House Bill report for (HB) 2485 which discusses the reasoning behind the bill.
[I]nterest on judgments should reflect to some degree economic reality at the time a judgment is entered. The current rate makes considerations of interest charges alone drive decisions on whether to appeal a case. Interest charges on a judgment *366 against a local government can grow to hundreds of thousands of dollars while a case is being appealed. The bill will let appeal decisions be made more on the merits of the case itself.
¶ 21 This legislative report shows a clear purpose  to align interest on tort judgments with the economy at judgment and help ensure that decisions to appeal are based on merit, rather than concern about the growth of a judgment due to interest. These are legitimate government interests, therefore the statute is constitutional "unless the classification rests on grounds wholly irrelevant to the achievement of a legitimate state objective." DeYoung, 136 Wash.2d at 144, 960 P.2d 919. The Fausts provide no evidence that the new method of determining the interest rate on tort judgments does not contribute to the achievement of the legitimate government objective. Instead, the Fausts merely argue that the statute is "punitive" because it requires a lower interest rate on tort judgments. As a result, the Fausts do not meet their burden of proof that the statute is unconstitutional beyond a reasonable doubt. The statute does not violate equal protection law.
¶ 22 We reverse and vacate the verdicts against Chapman and the Lodge. We deny the cross-appeal.
WE CONCUR: ELLINGTON and COLEMAN, JJ.
NOTES
[1] Except where necessary, in quoting the record, we use the correct spelling of Kinkaid throughout this opinion.
[2] The initial analysis was done on a plasma sample with a result of .16 percent. The legal standard for intoxication is based on whole blood BAC. The expert estimated Kinkaid's initial whole blood BAC was .14 percent based on a conversion that assumes 16 percent difference between plasma and whole blood BAC levels.
[3] "Obviously intoxicated" was the common law standard for overservice. The Washington Supreme Court has determined that RCW 66.44.200 establishes an "apparently under the influence of liquor" standard. Barrett, 152 Wash.2d at 274-75, 96 P.3d 386. Cases prior to Barrett refer to the "obviously intoxicated" standard but the required evidence does not appear to have changed. See, e.g., Christen v. Lee 113 Wash.2d 479, 487, 780 P.2d 1307 (1989); Purchase v. Meyer, 108 Wash.2d 220, 223, 737 P.2d 661 (1987).